109 F.3d 399
 Stefan BUCUR, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
Gabriela ROSUS, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
Gheorghe DRAGOS, Petitioner,
v.
IMMIGRATION AND NATURALIZATION SERVICE, Respondent.
 Nos. 96-2008, 96-2043 and 96-2190.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 13, 1997.
Decided March 26, 1997.
 
 Scott D. Pollock (argued), Pollock & Associates, Chicago, IL, for petitioner Stefan Bucur.
 Carl H. McIntyre, Jr., Department of Justice, Office of Immigration Litigation, Washington, DC, for respondent in 96-2008.
 Samuel Der-Yeghiayan, Immigration & Naturalization Service, Chicago, IL, Richard M. Evans, Jeffrey J. Bernstein (argued), David M. McConnell, Stephen W. Funk, Marion E. Guyton, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for respondent in 96-2008 and 96-2043.
 Y. Judd Azulay, Stephen D. Berman (argued), Azulay & Azulay, Chicago, IL, for petitioner Gabriela Rosus.
 David Rubman (argued), Chicago, IL, for petitioner Gheorghe Dragos.
 Janet Reno, U.S. Attorney General, Washington, DC, Jeffrey J. Bernstein (argued), Mark C. Walters, Christine Bither, Stephen W. Funk, Department of Justice, Civil Division, Immigration Litigation, for respondent in 96-2190.
 Before POSNER, Chief Judge, and CUMMINGS and CUDAHY, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 We have consolidated for decision three petitions to review orders by the Board of Immigration Appeals denying asylum to Romanian citizens. All three petitions claim that the petitioner was persecuted by the communist regime--Bucur because he is of mixed Romanian-Hungarian ethnicity and was a political opponent of the communist regime, Rosus because she is of mixed Romanian-Ukrainian ethnicity, and Dragos because he is a Jehovah's Witness. Bucur and Rosus anticipate further persecution if they are forced to return to Romania, while Dragos claims that his persecution by the communist regime was sufficiently serious to warrant a grant of U.S. asylum even though he is unlikely to be persecuted by the current regime.
 
 
 2
 Bucur is from Transylvania, a part of Romania that used to be part of Hungary and that has a large population of ethnic Hungarians long discriminated against by the Romanian majority. The communist regime had a policy of forcing minorities to assimilate. The policy was dropped after the overthrow of the communist dictator, Ceausescu, in 1989, but ethnic unrest continues. Indeed, the fall of communism in Central and Eastern Europe seems rather to have fanned than to have cooled ethnic tensions in the region, and while there is no indication of lethal discrimination by Romania against its minorities--the sort of thing one finds in what was once Yugoslavia--there is evidence of greater discrimination against ethnic Hungarians than before the collapse of the communist regime, Hengan v. INS, 79 F.3d 60, 62-63 (7th Cir.1996), although the situation may be mending. See Treaty between the Republic of Hungary and Romania on Understanding, Cooperation and Good Neighbourhood, art. 15(1)(b) (Sept. 16, 1996).
 
 
 3
 Bucur came to the United States in 1990, on a nonimmigrant visa, and has remained. He is 43 years old, and had worked as an engineer in Romania before he left. He now claims to be half-Hungarian, though on his original application for asylum he claimed to be of Romanian ethnicity and to belong to the Eastern Orthodox church, whereas most ethnic Hungarians are either Catholic or Protestant. He claims to have suffered some discrimination in education and employment when he was in Romania because of his half-Hungarian ethnicity, but apparently it was not severe, for he got a good job after completing a five-year college program in engineering. The job involved working with foreign specialists. This was a task for which he was particularly well suited because he speaks German and (he claims) Hungarian as well as Romanian, but it brought him under surveillance by the secret police, which was suspicious of anyone who had contacts with foreigners. He once participated in a workers' demonstration against the Ceausescu regime and afterwards was questioned by the secret police. He was not imprisoned or beaten but during the questioning a police officer yelled at him, "What were you doing downtown [at the demonstration], you moron Hungarian?" On another occasion the officer told Bucur that he would be better off if he let Romanians do the talking about their country's problems.
 
 
 4
 All this is most unpleasant, but we think the Board of Immigration Appeals was well within its authority in concluding that Bucur was not a victim of ethnic persecution. The Attorney General is authorized to grant asylum to "refugees," defined as persons "unable or unwilling" to return to their country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(a). If Bucur is telling the truth about his Hungarian ethnicity and how it affected his life in Romania (as we shall assume, the Board not having made a clearcut finding on his credibility), he was the victim of discrimination on account of his nationality. But discrimination is not persecution. Sharif v. INS, 87 F.3d 932, 935 (7th Cir.1996); Bastanipour v. INS, 980 F.2d 1129, 1133 (7th Cir.1992); Ghaly v. INS, 58 F.3d 1425, 1431 (9th Cir.1995). Otherwise hundreds of millions of people would be eligible for asylum in the United States. Granted, this would not be the end of the world. The statute creates a right only to ask the government to exercise discretion to grant or deny asylum favorably to the applicant; it does not confer a right to asylum. 8 U.S.C. § 1158(a); INS v. Cardoza-Fonseca, 480 U.S. 421, 443-44, 107 S.Ct. 1207, 1219-20, 94 L.Ed.2d 434 (1987). So the Board could if it wanted turn down the vast majority of eligible applicants, cf. Hengan v. INS, supra, 79 F.3d at 62, and though in fact denials of asylum to persons found to be refugees have apparently been rare, 2 Charles Gordon, Stanley Mailman & Stephen Yale-Loehr, Immigration Law and Procedure § 34.02[d], p. 34-56.1 (1995); Richard D. Steel, Steel on Immigration Law § 8.08, p. 8-31 (2d ed.1996), we shall see that refugees who do not face further persecution are unlikely to be granted asylum. What is more, there are now mandatory grounds for denial of asylum to some refugees. Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-208, § 604, 110 Stat. 3009 (1996). Truncating the Board's discretion from the other side, the alien who can prove that he has a "clear probability" of losing his life or his freedom if he is deported to a particular country has a right not to be deported to that country, rather than merely a right to ask for mercy. 8 U.S.C. § 1253(h)(1); Sale v. Haitian Centers Council, Inc., 509 U.S. 155, 159-60, 113 S.Ct. 2549, 2552-54, 125 L.Ed.2d 128 (1993); INS v. Stevic, 467 U.S. 407, 425, 104 S.Ct. 2489, 2498-99, 81 L.Ed.2d 321 (1984).
 
 
 5
 So the domain in which the Board exercises discretion may in practice be considerably narrower than we are suggesting--and anyway most of those hundreds of millions of victims of discrimination in foreign lands don't have the money to travel to the United States. Still, the statute was designed as a filter, and the mesh would be too broad if every foreign victim of discrimination in his homeland were eligible for asylum. There is discrimination even in the United States; many thousands of judicial and administrative claims are filed every year complaining of discrimination because of race, ethnicity, sex, or religion, and while many of the claims do not have merit many others do. There is much worse discrimination against minorities in many other countries.
 
 
 6
 The difference between persecution and discrimination is one of degree, which makes a hard and fast line difficult to draw. But we think it a reasonable generalization that the persecution of members of minority groups (such as ethnic Hungarians in Romania) differs from discrimination against them in being either official and severe, or nonofficial but lethal and condoned. Giving an official imprimatur to discrimination magnifies its gravity, as is implicit in the state action requirement of the Fourteenth Amendment. So a Romanian law requiring ethnic Hungarians to wear an armband identifying them as Hungarian, or forbidding them to attend college or to live in designated areas, would constitute persecution, even if it did not prevent them from earning a livelihood, cf. Borca v. INS, 77 F.3d 210, 215-17 (7th Cir.1996), while a wave of pogroms against Hungarians, or a campaign of expulsions from the country, would also constitute persecution even if the pogroms or the expulsions were merely condoned rather than orchestrated by the government. Hengan v. INS, supra, 79 F.3d at 61-63; Arteaga v. INS, 836 F.2d 1227, 1231 (9th Cir.1988). But a law merely reserving a certain percentage of college places well short of 100 percent for Romanians, or requiring Hungarians to learn Romanian, would not be persecution; nor a pattern of private discrimination or of low-level, ad hoc, official discrimination, such as the disparaging reference to Bucur's nationality in his interview with the secret police. There is, of course, no bright line between discrimination and persecution; policing the boundary is the responsibility of the Board of Immigration Appeals, not of us; it is reasonably clear that Bucur has not crossed it.
 
 
 7
 Rosus's case is similar but a little stronger. She is 29, and has been in the United States since 1991. She grew up in the region of Romania that bordered on the Ukraine. Her father is a member of Romania's Ukrainian minority. Her mother, an ethnic Romanian, was ostracized by her Romanian friends for marrying a Ukrainian. Her father was able to become a dentist only because his grades were so high that no pretext for turning him down could be found. But his only patients were fellow Ukrainians and Hungarians; ethnic Romanians shunned him. When he returned to work after an accident, he was told that he should retire because many ethnic Romanian dentists were ready and willing to replace him. As soon as Ceausescu fell, he was forced to retire. His retirement benefits were delayed, as were his wife's.
 
 
 8
 Rosus was the only Ukrainian in her school, where she was picked on a lot by the Romanian students, who called her "Bolshevik" because they blamed the Ukrainians (the Ukraine being a part of the Soviet Union at the time) for bringing communism to Romania. The results of her high school entrance exams were falsified to keep her off the academic track, and when she graduated she was forced to accept a miserable job in a furniture factory. Later she obtained clerical employment, but she was discriminated against in pay and working conditions because of her minority status.
 
 
 9
 If Romania denied its Ukrainian citizens the right to higher education enjoyed by ethnic Romanians, this would be, we imagine, a form of persecution. (De Souza v. INS, 999 F.2d 1156, 1159 (7th Cir.1993), and Faddoul v. INS, 37 F.3d 185, 189 (5th Cir.1994), are not to the contrary; they involved the denial to noncitizens of equal educational opportunities with citizens.) But this has not been shown. Rosus's father obtained a professional education, and her sister graduated from medical school. In fact it seems that every member of her family is a medical professional except her. There may be a double standard, requiring Ukrainians and other minority Romanians to do better than the majority in order to succeed professionally; that is a common consequence of ethnic discrimination. But without more it does not rise to the level of persecution. If it did, affirmative action in favor of a minority would constitute persecution of the majority--an extreme position. We are not pointed to any official Romanian policy of discriminating against its Ukrainian citizens, and the kind of workplace harassment that Rosus encountered is a frequent experience of minorities everywhere. The Board was entitled to conclude that Rosus was not a victim of persecution.
 
 
 10
 The asylum statute conditions eligibility for asylum on proof either that the applicant has been persecuted or that he has a well-founded fear of being persecuted if he returns to his country. A favorable exercise of discretion--for recall that the only right conferred by the statute is a right to appeal to the Board's discretion--is more likely if the applicant has a reasonable fear of future persecution. If he has none, if he merely was persecuted in the past, perhaps by a regime that has utterly perished, deporting him will not place him at risk of further persecution. The distinction is not important in the cases of Bucur and Rosus, who claim that the collapse of communism has inflamed rather than dampened the ethnic hostility that they construe as persecution. But the distinction is vital to our last case, that of Dragos, who claims to have been persecuted for his religion. Now 34 years old, he was born into a family of Jehovah's Witnesses. The communist regime forbade Jehovah's Witnesses to practice their religion because it is a proselytizing religion. Dragos refused, on religious grounds, to join any communist group, and as a result his school years were full of threats, discrimination, and beatings, including beatings by the secret police at their office. After he graduated from high school, he tried to escape from the country by swimming the Danube, but he was caught and sent to jail for three months, where he was beaten, starved, and tortured. After being released he was able to obtain factory employment. But until the fall of Ceausescu he was kept under surveillance by the secret police and was arrested several times and sometimes beaten. He came to the United States fifteen months after the communist regime collapsed.
 
 
 11
 With the fall of Ceausescu, religious freedom was restored. Jehovah's Witnesses can practice their religion freely in Romania--as freely, as far as we know, as they can in the United States (which is not completely freely, see, e.g., Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Jehovah's Witnesses v. King County Hospital Unit No. 1, 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968) (per curiam), affirming 278 F.Supp. 488 (W.D.Wash.1967); Application of President & Directors of Georgetown College, Inc., 331 F.2d 1000, 1002 (D.C.Cir.1964)). Dragos has abandoned his argument that he has a well-founded fear of persecution should he return to Romania. But the statute does not require this. All the applicant need show to qualify for asylum is that he was persecuted. At first glance it may seem curious that a person who has no fear of future persecution can make a case for being granted asylum, no matter what he suffered in the past. But if one thinks of the situation of the German Jews who left Germany during the Nazi period and didn't want to return when the Nazi regime collapsed, one can begin to see the point. The collapse erased any well-founded fear of future persecution of Jews by Germany, yet, after what had happened, to force German Jews who had managed to escape to America to go back to Germany would have been a considerable cruelty. Skalak v. INS, 944 F.2d 364, 365 (7th Cir.1991). As this example suggests, however, there is a double standard at work in asylum cases: if the applicant is not in danger of being persecuted if he is deported, he will not be granted asylum unless the persecution from which he fled was especially heinous. The double standard is now codified in the INS's regulations, 8 C.F.R. § 208.13(b)(1)(ii), which we do not understand Dragos to be challenging. The regulation says that the applicant who has been persecuted but is not in danger of future persecution can avoid deportation only by showing "compelling reasons" for not being returned to the country that persecuted him, and we take this to be designed for the case of the German Jews, the victims of the Chinese "Cultural Revolution" (In re Chen, 20 I. & N. Dec. 16, 18-19 (1989)), survivors of the Cambodian genocide, and a few other such extreme cases.
 
 
 12
 The threshold question is whether Dragos was persecuted at all. If in fact the communist regime forbade Jehovah's Witnesses to practice their religion, just as the Roman Empire until Constantine forbade Christians to practice their religion, that would be persecution; it is virtually the definition of religious persecution that the votaries of a religion are forbidden to practice it. Whether it would be enough that there was a law on the books that the regime winked at, so that in fact Jehovah's Witnesses could practice their religion more or less freely, we need not decide. The only evidence in the record is that Jehovah's Witnesses were forbidden to practice their religion during the communist period; and Dragos is (and was; he is not like the petitioner in the Bastanipour case, who claimed to have converted to Christianity while in prison in the United States, and feared that he would be persecuted as a Muslim apostate if he was returned to Iran) a Jehovah's Witness. In Dobrican v. INS, 77 F.3d 164, 166 (7th Cir.1996), we said that under the Ceausescu regime "Jehovah's Witnesses suffered significant harassment and persecution by both governmental personnel and private citizens," though we also upheld the Board's finding that the applicant, although a Jehovah's Witness, had not himself been persecuted on account of his religion. Id. at 167. We are given no reason to suppose that our assessment of the situation of Jehovah's Witnesses under the Ceausescu regime was erroneous.
 
 
 13
 In light of Dobrican, however, we cannot infer that simply because Jehovah's Witnesses were persecuted, Dragos was. He may or may not have been. The Board's analysis of this issue was inadequate. It said that the treatment meted out to Dragos, even if it was motivated by his religion, wasn't harsh enough to count as religious persecution; and the government's brief in this court adds that Dragos can't have been persecuted since he was allowed to graduate from high school. That's like saying of a Christian in Rome in 100 A.D. that because he wasn't thrown to the lions in the Coliseum he can't have been persecuted. There are degrees of persecution. If a person is forbidden to practice his religion, the fact that he is not imprisoned, tortured, or banished, and is even allowed to attend school, does not mean that he is not a victim of religious persecution. If a government as part of an official campaign against some religious sect closed all the sect's schools (but no other private schools) and forced their pupils to attend public school, this would be, we should think, although we need not decide, a form of religious persecution.
 
 
 14
 The Board was also wide of the mark when it pointed out that the motive for Dragos's attempt to flee the country is unclear and hence that it is unclear whether the jailing and arrests and beatings that followed the attempt to escape can be attributed to his religion. If you are beaten as a direct or an indirect consequence of your religion, that is some evidence of religious persecution. But if you are forbidden to practice your religion, that is religious persecution even if you don't react to it by trying to flee the country.
 
 
 15
 If the only issue were whether Dragos had been persecuted, we would have to remand his case, because the Board's analysis of the issue was inadequate. And likewise if there were reason to suppose that, if Dragos was persecuted, the persecution was severe enough to qualify him for asylum despite the absence of a reasonable fear of future persecution, we would have to remand, because the Board did not offer an appraisal of the severity of the treatment to which Dragos had been subjected. But despite the deficiencies in the Board's handling of the case, the denial of asylum to Dragos must stand. It is evident that his persecution was not of the severity that would qualify him for asylum under the regulation governing cases in which the refugee has no reasonable fear of future persecution. Mild persecution may be something of an oxymoron, but the regulation makes clear that a refugee who has no reasonable fear of future persecution must indeed prove that his past persecution was a severe rather than a mild (bordering on "mere" discrimination) form of persecution. So clear is it that Dragos has failed to carry this burden that the Board's errors of analysis must be deemed harmless. E.g., Ortiz-Salas v. INS, 992 F.2d 105, 106 (7th Cir.1993); Nazaraghaie v. INS, 102 F.3d 460, 465 (10th Cir.1996). All three orders are therefore
 
 
 16
 AFFIRMED.