David Wachira NGARURIH, Petitioner,

v.

John D. ASHCROFT, Attorney General of the United States, Respondent.

No. 03–1144.

United States Court of Appeals, Fourth Circuit.

Argued: Jan. 20, 2004.

Decided: June 10, 2004.

**ARGUED:** Philip Gordon Schrag, Center for Applied Legal Studies, Georgetown University Law Center, Washington, D.C., for Petitioner. Deborah Nirmala Misir, Trial Attorney, Civil Division, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent. **ON BRIEF:** Peter D. Keisler, Assistant Attorney General, Papu Sandhu, Senior Litigation, Civil Division, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for Respondent.

Before WILKINSON, GREGORY, and SHEDD, Circuit Judges.

Judge GREGORY wrote an opinion concurring in part and dissenting in part.

## OPINION

SHEDD, Circuit Judge:

The Board of Immigration Appeals ("BIA") affirmed an order denying David Wachira Ngarurih's request for asylum but granting voluntary departure. Within the time permitted for appeal and shortly before the period for voluntary departure expired, Ngarurih filed this petition for review. Applying the narrow standards of review prescribed by Congress in the immigration statute, we conclude that the BIA's denial of asylum is neither manifestly contrary to law nor an abuse of discretion. We further conclude that the statute does not permit a court of appeals to alter the period allowed by the BIA for voluntary departure, either by reinstating or staying the departure period. Accordingly, the petition for review is denied.

### I.

Ngarurih is a native and citizen of Kenya who entered the United States in May 1995 on a nonimmigrant student visa. Ngarurih filed an application for asylum in May 2000, alleging that he had been persecuted by the Kenyan government due to his criticisms of President Daniel Arap Moi and his government's tea farming policies.

Ngarurih began farming tea on a portion of his father's land in the early 1990s. The Kenyan government owned the tea plants and licensed the right to cultivate them. Under the license, tea farmers were required to maintain their plantations in accordance with instructions issued by the Kenya Tea Development Authority ("KTDA"); farmers could neither increase nor decrease the number of tea plants they cultivated without KTDA approval. Failure to comply with the conditions of the license could result in a fine, imprisonment, or both.

Licensed farmers were required to sell their tea to the KTDA, which marketed the tea internationally. Although the KTDA sold tea on the international market for 40 shillings per kilogram, it paid tea farmers only 3 shillings per kilogram. This payment typically was inadequate to cover the costs of production, so that tea farmers were almost always in debt.

In 1992, Ngarurih and some friends publicly protested the KTDA's policies and announced that they would no longer sell their tea to the KTDA. Soon other farmers began discussing a widespread boycott of the KTDA. Ngarurih then organized a march to the local KTDA tea processing factory to demand an accounting for the excess profits that had been withheld from farmers. As a result of the boycott that Ngarurih organized, tea production in

Kenya's Central Province slowed dramatically.[1]

On July 17, 1992, Ngarurih organized a march to take the farmers' protest to local government officials in the Central Province. Some thirty thousand people joined this march. Ngarurih spoke to the crowd, denouncing the KTDA's policies and the Moi government's failure to address the needs of poor farmers. The district commissioner heard the farmers' protests and asked that a committee present him written demands. Among the farmers' demands were that the district tea committee be dissolved, that certain licenses and taxes be eliminated, and that the KTDA decentralize management of factories and increase monthly payments to farmers.

A few days after the July 17 march, security officers escorted Ngarurih to the home of the district commissioner. According to Ngarurih, the district commissioner offered him a bribe to call off the boycott of the KTDA. Ngarurih refused the offer. Shortly after this incident, President Moi issued a statement warning "those inciting the farmers" to end the boycott or face "dire consequences." Concerned for his safety, Ngarurih went into hiding. After hearing that other tea farmers were being arrested, Ngarurih surrendered to district authorities in early August 1992.

Ngarurih testified that three officers took him from his cell at the local police station, handcuffed and blindfolded him, and drove him to a wooded area, where they demanded that he name the other leaders of the boycott. Under threat of execution, Ngarurih refused to identify the other leaders. The officers then took Ngarurih to a prison, where Ngarurih was stripped of his clothes and placed in a dark cement cell. The cell had no light, no windows, and no toilet. For one week, prison officials flooded the cell with cold water at irregular intervals. The water level rose and fell, often rising to the level of Ngarurih's chest. Ngarurih could not eat or sleep, nor was he allowed contact with other people. During this period, Ngarurih experienced hallucinations in which he saw himself separate from his own body, floating in another part of the cell. Prison officials moved Ngarurih into a dry solitary confinement cell, where he remained for several months.[2]

After being relocated to the jail in his home district, Ngarurih was tried on a charge of treason. The local magistrate dismissed the charge for lack of evidence and ordered Ngarurih released. Local authorities immediately charged Ngarurih with breach of the peace. The magistrate offered to release Ngarurih if he would post a bond of one million shillings and agree to refrain from political activity for one year. Under the magistrate's conditions, Ngarurih could not meet with more than three Kenyans at a time or leave his home district without permission. Ngarurih would have to report to local police officials every other week. Ngarurih agreed to these conditions, and other tea farmers raised the money (pledging their land titles as security) to satisfy the bond. Thus, after about eight months of detention, Ngarurih was released from custody in early April 1993.

---

1.  Kenya is divided into seven provinces, each of which is further divided into districts comprised of smaller villages. The Central Province is located just north of Nairobi.

2.  It is unclear how long Ngarurih remained at the prison. In his original I–589 form, Ngarurih stated that he was kept in solitary confinement at the prison for two months. In a later affidavit, he stated that he had come to believe that he spent six months there.

Rather than face another confrontation with the government, Ngarurih decided to leave Kenya. With the help of three Peace Corps volunteers in his district, Ngarurih obtained a student visa to enter the United States in May 1995. Ngarurih attended St. Gregory's College in Oklahoma, where he played basketball and earned an associate's degree in business. Ngarurih later earned a degree in international business management from the University of San Francisco.

Ngarurih returned to Kenya in June 1997 after learning that his younger brother Njoka—whom Ngarurih had reared from childhood—had been jailed. Njoka had pled guilty to two counts of defiling a girl under the age of fourteen and sentenced to eight years in prison with hard labor and "six strokes of the cane" for each count. Once Ngarurih arrived in his village, he wrote to the trial court to obtain Njoka's file; the court granted Ngarurih's request and sent him the records. Ngarurih hired an attorney to challenge Njoka's conviction, and he traveled to other villages to investigate the facts of the case. Ngarurih's efforts were ultimately successful: His brother's conviction was reversed and his case remanded for a new trial. Ngarurih personally posted a bond to secure Njoka's release from prison. Several days after Njoka's release, Ngarurih returned to the United States in August 1997.

Ngarurih's student visa was set to expire in 2000. Not wanting to return to Kenya, Ngarurih filed an initial application for asylum and withholding of removal based on past persecution by the Moi government. The Immigration and Naturalization Service ("INS") commenced removal proceedings.[3] Ngarurih conceded that he was removable and applied for asylum, withholding of removal, and protection under the Convention Against Torture. Ngarurih asserted that he should be deemed a refugee based on his past persecution. In addition, Ngarurih asserted that he had a well-founded fear of future persecution because (1) President Moi remained in power, (2) Kenyan authorities continued to employ torture tactics, and (3) Ngarurih would likely come to these authorities' attention as an outspoken political opponent.

The Immigration Judge ("IJ") found that Ngarurih had been subject to past persecution in Kenya, but she denied the request for asylum because Ngarurih's two-month return to Kenya in 1997 demonstrated that he was willing to return to his native country and that he could be involved in public matters—such as a criminal appeal—without reprisal by the Kenyan government. Although the IJ denied Ngarurih's claims for asylum and withholding of removal, she granted voluntary departure, giving Ngarurih thirty days to leave the United States at his own expense and without further government action. Ngarurih appealed the IJ's order to the BIA, which affirmed the IJ's disposition of Ngarurih's claims.

The BIA concluded that Ngarurih's return to Kenya in 1997 constituted a "fundamental change in circumstances [that] diminishe[d] his claim" that he feared persecution in Kenya.[4] Likewise, the BIA

---

3. On March 1, 2003, the immigration service functions of the former Immigration and Naturalization Service were transferred to the Bureau of U.S. Citizenship and Immigration Services within the Department of Homeland Security. For clarity's sake, and because these proceedings occurred before March 2003, we will refer to the INS rather than its successor entity.

4. The BIA noted that Daniel Arap Moi had been replaced by Mwai Kibaki, who was elected President in December 2002. The BIA did not rely on this fact, however, in concluding that Ngarurih could not demonstrate a well-founded fear of persecution.

concluded that Ngarurih's return to Kenya diminished his claim that he was entitled to asylum based upon the severity of his past persecution. Thus, the BIA affirmed the IJ's resolution of Ngarurih's asylum claim and granted Ngarurih permission to depart the United States voluntarily. According to the BIA's order, Ngarurih had thirty days from the date of entry of the order (or any extension granted by the district director) to depart the United States. The order further provided that Ngarurih's failure to depart within that 30–day period would result in his being removed, fined, and ineligible from certain forms of relief for a period of ten years. Shortly before that voluntary departure period expired, Ngarurih filed this petition for review.

## II.

The Immigration and Nationality Act authorizes the Attorney General, in his discretion, to confer asylum on any refugee. 8 U.S.C. § 1158(b)(1). A "refugee" is any person "who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, [the home] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). An applicant for asylum may qualify as a refugee either because he suffered past persecution or because he has a well-founded fear of future persecution. 8 C.F.R. § 208.13(b). Under either standard, the applicant bears the burden of demonstrating eligibility for asylum. 8 C.F.R. § 208.13(a); *Gonahasa v. INS,* 181 F.3d 538, 541 (4th Cir.1999).

An applicant "shall be found to be a refugee on the basis of past persecution if the applicant can establish that he or she has suffered persecution in the past in the applicant's country of nationality ... on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution." 8 C.F.R. § 208.13(b)(1). An applicant who demonstrates that he was the subject of past persecution is presumed to have a well-founded fear of persecution. *Id.* This presumption may be rebutted if the immigration judge finds by the preponderance of evidence that (1) there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution or (2) the applicant could avoid future persecution by relocating to another part of his native country. 8 C.F.R. § 208.13(b)(1)(i).

■ Without regard to past persecution, an applicant has a well-founded fear of persecution if (1) he "has a fear of persecution in his country of nationality on account of race, religion, nationality, membership in a particular social group, or political opinion," (2) "there is a reasonable possibility of suffering such persecution if he or she were to return to that country," and (3) he is "unable or unwilling to return to, or avail himself or herself of the protection of, that country because of such fear." 8 C.F.R. § 208.13(b)(2)(i). The well-founded fear of persecution standard involves objective and subjective components. "An applicant may satisfy the subjective element by presenting candid, credible, and sincere testimony demonstrating a genuine fear of persecution." *Chen v. INS,* 195 F.3d 198, 201–02 (4th Cir.1999) (internal quotations omitted). The objective element requires a showing of specific, concrete facts that would lead a reasonable

person in like circumstances to fear persecution. *Huaman–Cornelio v. BIA,* 979 F.2d 995, 999 (4th Cir.1992).

■ We must uphold the BIA's determination that Ngarurih is ineligible for asylum unless that determination is "manifestly contrary to the law and an abuse of discretion." 8 U.S.C. § 1252(b)(4)(D). Considering the record as a whole, we ask whether the BIA's ruling is "supported by reasonable, substantial, and probative evidence," and we will reverse the BIA's decision only if Ngarurih presented evidence that was "so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 483–84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). *See also Rusu v. INS,* 296 F.3d 316, 325 n. 14 (4th Cir. 2002); *Gonahasa,* 181 F.3d at 541; *Huaman–Cornelio,* 979 F.2d at 999.

■ Where, as here, the BIA did not adopt the IJ's opinion but offered its own reasons for denying relief, we review the BIA's order rather than the IJ's ruling. *See Rusu,* 296 F.3d at 320 n. 6; *Huaman–Cornelio,* 979 F.2d at 999. Contrary to Ngarurih's assertion, the BIA's order adequately discloses the grounds upon which it denied Ngarurih's requests for relief. *See SEC v. Chenery Corp.,* 318 U.S. 80, 95, 63 S.Ct. 454, 87 L.Ed. 626 (1943).[5]

## A.

■ The BIA first concluded that Ngarurih's voluntary return to Kenya in 1997 undermined his claim to have a well-founded fear of persecution. Citing 8 C.F.R. § 208.13(b)(1)(i), the BIA reasoned that although Ngarurih's past persecution established a presumption of fear of persecution, the evidence of Ngarurih's two-month stay in Kenya without incident constituted evidence of a changed circumstance that rebutted the presumption. More generally, the BIA analogized Ngarurih's return to Kenya to a case in which an asylum applicant leaves the United States without first obtaining advance parole; in such a case, the applicant would be deemed to have abandoned his asylum application. *See* 8 C.F.R. § 208.8(a).[6]

Ngarurih testified that he returned to Kenya in 1997 when he learned that his younger brother had been sentenced to a term of imprisonment for rape. Suspect-

---

5. The Seventh Circuit's decision in *Mengistu v. Ashcroft,* 355 F.3d 1044 (7th Cir.2004), does not compel a different conclusion. In that case, the BIA offered a single justification for denying the alien's motion to reopen, and the court of appeals invoked *Chenery* in declining to consider alternative grounds for denying the motion. *Id.* at 1046–47. The court then vacated the BIA's order because the sole ground for its decision was insufficient to sustain the decision. *Id.* at 1047–48. It is clear from the order in this case that the BIA, considering the circumstances surrounding Ngarurih's· return to Kenya in 1997, denied relief based on findings that Ngarurih did not establish a well-founded fear of future persecution or the necessary conditions for relief based on the severity of his past persecution. We address only these findings, subject to the harmless-error analysis that *Mengistu* itself recognizes. *See id.* at 1047.

6. Ngarurih asserts that the BIA ruled, as a matter of law, that the simple fact of Ngarurih's return to Kenya rendered him ineligible for asylum. The BIA's order suggests no such ruling. To the contrary, the order indicates that the BIA considered the facts and circumstances of Ngarurih's return to Kenya in the context of a routine analysis under 8 C.F.R. § 208.13(b)(1)(i). Thus, Ngarurih's argument based on the United Nations High Commissioner for Refugees Handbook—which appears to reject a *per se* rule that return to the home country results in loss of refugee status—is misplaced. In any event, the Supreme Court has noted that the Handbook is not binding on the BIA or this court. *INS v. Cardoza–Fonseca,* 480 U.S. 421, 439 n. 22, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987).

ing that his brother had been falsely accused, Ngarurih left the United States to assist in the criminal appeal. When he arrived back in his home village, Ngarurih wrote a letter to the trial court, bearing his own signature, requesting his brother's file. After retaining an attorney to prosecute the appeal, Ngarurih traveled to other villages to investigate the facts of his brother's case. Once his brother's conviction was reversed, Ngarurih posted the bond that secured his brother's release from prison.

Ngarurih's presence in Kenya was known by his family, other tea farmers who sought to persuade him to run for Parliament, and government officials. Indeed, Ngarurih stated that he was approached by a police officer who said, "So you're back . . . we know you're back and don't worry, we'll be watching you." Thus, despite his self-described efforts to maintain a low profile, Ngarurih undertook activities that placed him in direct contact with government officials, seeking the protection of Kenya's laws. Yet there is no evidence that Ngarurih suffered any mistreatment at the hands of the Kenyan government during his two-month stay in 1997.

These facts, found by the IJ and established by Ngarurih's own testimony, support the BIA's conclusion that Ngarurih's return to Kenya in 1997 constituted a "fundamental change in circumstances" sufficient to rebut the presumption (raised by the fact of past persecution) that Ngarurih

had a well-founded fear of future persecution. The question for the BIA was not whether Ngarurih had a well-founded fear of persecution when he returned to Kenya in 1997. The pertinent question is whether Ngarurih qualified as a "refugee"—a person unable or unwilling to return to his home country due to a well-founded fear of persecution—at the time he applied for asylum. There is perhaps no evidence more relevant to this question than what happened (or did not happen) to Ngarurih when he actually returned to Kenya in 1997.

■ While one could argue that the factfinder could have reached a different conclusion, it is not our task to "reweigh the evidence and determine which of the competing views is more compelling. It is instead to ensure that substantial evidence supports the BIA's judgment." *Gonahasa*, 181 F.3d at 542. Considering the record as a whole, we conclude that substantial evidence supports the BIA's denial of Ngarurih's application for asylum.[7] Thus, we cannot say that the BIA's ruling is manifestly contrary to law or an abuse of discretion. *See* 8 U.S.C. § 1252(b)(4)(D).

### B.

■ The BIA further ruled that Ngarurih's return to Kenya in 1997 undermined his claim to so-called "humanitarian asylum." Even in the absence of a well-founded fear of persecution, an immigration judge has discretion to grant asylum to an applicant who demonstrates "compel-

---

7. Ngarurih sought withholding of removal as an alternative to asylum. Withholding of removal is available only to an alien who can demonstrate a "clear probability" of persecution on account of his race, religion, nationality, membership in a social group, or political opinion. *Rusu*, 296 F.3d at 324 n. 13. Because this standard is more demanding than the "well-founded fear" standard applicable to asylum requests, Ngarurih's failure to satis-

fy the lesser standard means that he cannot demonstrate entitlement to withholding of removal. *See Huaman–Cornelio*, 979 F.2d at 1000. Ngarurih does not challenge the denial of relief under the Convention Against Torture, and we do not consider that issue here. *See Yousefi v. INS*, 260 F.3d 318, 326 (4th Cir.2001) (stating that failure to raise a challenge in an opening brief results in abandonment of that challenge).

ling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution" or that "there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 208.13(b)(1)(iii). *See also Krastev v. INS*, 292 F.3d 1268, 1271 (10th Cir.2002) (describing asylum conferred under this regulation as "humanitarian asylum").

■ We have construed this exception narrowly, stating that humanitarian asylum is available only in " 'the rare case where past persecution is so severe that it would be inhumane to return the alien even in the absence of any risk of future persecution.' " *Gonahasa*, 181 F.3d at 543 (quoting *Vaduva v. INS*, 131 F.3d 689, 690 (7th Cir.1997)). *Accord Toptchev v. INS*, 295 F.3d 714, 721–22 (7th Cir.2002); *Krastev*, 292 F.3d at 1280. In short, "[e]ligibility based on severity of persecution alone is reserved for the most atrocious abuse." *Gonahasa*, 181 F.3d at 543. *Accord Bucur v. INS*, 109 F.3d 399, 405 (7th Cir.1997) (describing the "humanitarian asylum" regulation as "designed for the case of the German Jews, the victims of the Chinese 'Cultural Revolution,' survivors of the Cambodian genocide, and a few other such extreme cases").

The BIA concluded that Ngarurih's return to Kenya in 1997—a return made for the purpose of assisting in his brother's appeal in Kenya's courts—was a "willing" return that undermined his present claim to be "unwilling" to return to Kenya based on his past persecution. While we have no doubt that Ngarurih felt a need to help his brother through legal processes, that fact does not answer the question whether the circumstances were so objectively compelling as to render Ngarurih's return to Kenya "unwilling." After reviewing the entire record, and considering the particular facts of Ngarurih's return, we cannot say that the BIA's conclusion was manifestly contrary to law or an abuse of discretion. *See* 8 U.S.C. § 1252(b)(4)(D).

■ Even if the BIA erred in finding Ngarurih willing to return to Kenya, that error was harmless.[8] Ngarurih's mistreatment—horrible as it was—does not compare in severity to the kinds of persecution for which the humanitarian asylum regulation was designed. The seminal case on humanitarian asylum involved a native of China who testified that both he and his family suffered persecution for several years during the Cultural Revolution. *Matter of Chen*, 20 I. & N. Dec. 16, 19 (BIA 1989). When Chen was only eight years old, his father, a Christian minister, became a target of the Red Guards. *Id.* The Red Guards ransacked his house, put him in prison, and dragged him through the streets more than fifty times over several months. *Id.* During a Bible burning

**8.** Harmless-error analysis applies in immigration cases. *See Gonahasa*, 181 F.3d at 544 (citing *Bucur*, 109 F.3d at 405–06). While the general rule is that "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained," *Chenery*, 318 U.S. at 95, 63 S.Ct. 454, reversal is not required when the alleged error "clearly had no bearing on the procedure used or the substance of the decision reached," *Massachusetts Trs. of E. Gas & Fuel Associates v. United States*, 377 U.S. 235, 248, 84 S.Ct. 1236, 12 L.Ed.2d 268 (1964). *Accord In re Watts*, 354 F.3d 1362, 1370 (Fed.Cir. 2004) (stating that the *Chenery* principle "does not obviate the need to consider the issue of harmless error"); *Nazaraghaie v. INS*, 102 F.3d 460, 465 (10th Cir.1996) (concluding that the BIA's alleged failure to consider certain evidence was harmless error since "the result in this case would be no different"); *Sahara Coal Co. v. Office of Workers' Comp. Programs*, 946 F.2d 554, 558 (7th Cir.1991) (noting that "harmless-error doctrine is available in judicial review of administrative action; it is an exception to the *Chenery* principle").

in 1967, Chen's father was pushed into a bonfire and badly burned. *Id.* Chen, still only a child, was put on house arrest for six months; when he cried, Red Guards kicked and bit him and deprived him of food. *Matter of Chen,* 20 I. & N. Dec. at 20. Although Chen was ultimately allowed to attend school, his persecution did not stop. On different occasions, Chen was pelted with rocks, denied medical care, and exiled to rural villages for "re-education." *Id.* Even though the regime had changed such that Chen could not demonstrate a well-founded fear of persecution, the BIA granted Chen humanitarian asylum. *Matter of Chen,* 20 I. & N. Dec. at 19–21.

At about the same time that Ngarurih was being jailed and tortured for his political opposition in Kenya, David Daada Gonahasa was suffering similar mistreatment in Uganda. After organizing rallies in opposition to the ruling party, Gonahasa was seized by military intelligence officers, "stripped, beaten, cut on his arms by bayonets, and confined in a small cell." *Gonahasa,* 181 F.3d at 540. He later learned that government officers had "visited his home, roughed up his wife, and threatened to kill him." *Id.* On these facts, we concluded (in dicta) that Gonahasa was not entitled to humanitarian asylum because his past persecution was "simply not severe enough" to warrant such relief. *Gonahasa,* 181 F.3d at 544.

We later denied humanitarian asylum to Constantin Rusu, a native Romanian who was persecuted by the Ceausescu regime for organizing a transcendental meditation group. *Rusu,* 296 F.3d at 318. Rusu alleged that he was "interrogated and assaulted on multiple occasions by the Romanian secret police (the Securitate)" and that on one occasion, "they tortured him by removing his teeth with pliers and a screwdriver." *Id.* We concluded that "although the persecution he suffered ...

was horrible, it is not of the scale warranting a grant of asylum." *Rusu,* 296 F.3d at 325.

We have reviewed the entire record in this case and conclude that Ngarurih's past persecution was no more severe than the persecution suffered by Gonahasa and Rusu, and not nearly as severe as the persecution suffered by Chen. Even if Ngarurih were unwilling to return to his home country, he cannot establish past persecution severe enough to warrant relief under § 208.13(b)(1)(iii). Thus, we cannot say that the BIA's denial of humanitarian asylum in this case is manifestly contrary to law or an abuse of discretion. *See* 8 U.S.C. § 1252(b)(4)(D).

### C.

Having concluded that the evidence in the record does not compel the granting of asylum, we address Ngarurih's alternative request to restore his opportunity to depart the United States voluntarily. Both the IJ and the BIA granted Ngarurih voluntary departure. This relief was available for thirty days after the BIA's order was filed, and that period has long since expired. Relying upon our decision in *Ramsay v. INS,* 14 F.3d 206 (4th Cir. 1994), Ngarurih urges us to reinstate the BIA's award of voluntary departure by restarting the 30–day period granted by the BIA's order.

Ngarurih's request implicates the Illegal Immigration and Immigrant Responsibility Act of 1996 ("IIRIRA"), an enactment well known for restricting judicial review of discretionary decisions in immigration matters. *See Reno v. American–Arab Anti–Discrimination Cmte.,* 525 U.S. 471, 486, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) (noting that "many provisions of IIRIRA are aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the

legislation").[9] Before IIRIRA, it was unsettled whether courts of appeals had authority to reinstate voluntary departures. Some courts held that absent a specific grant of authority to award such relief, it was left to the Attorney General alone to decide whether to extend the period for voluntary departure. *See, e.g., Nkacoang v. INS,* 83 F.3d 353, 357 (11th Cir.1996); *Castaneda v. INS,* 23 F.3d 1576, 1580 (10th Cir.1994); *Alsheweikh v. INS,* 990 F.2d 1025, 1027 (8th Cir.1993). The Ninth Circuit, on the other hand, held that reinstatement of voluntary departure was automatic upon affirmance of a final order of deportation. *Contreras–Aragon v. INS,* 852 F.2d 1088, 1096–97 (9th Cir.1988) (*en banc*). Other courts held that nothing prevented a court of appeals from reinstating voluntary departure, under certain limited circumstances, in the course of considering a final order of deportation. *Kaczmarczyk v. INS,* 933 F.2d 588, 598 (7th Cir.1991); *Umanzor–Alvarado v. INS,* 896 F.2d 14, 15–16 (1st Cir.1990).

We held in *Ramsay* that a court of appeals could reinstate a voluntary departure in two circumstances: (1) where "the INS is wielding its discretion to withhold voluntary departure to deter applicants from seeking judicial review of BIA decisions," or (2) where "the [INS] does not suggest it will present the district director with any other reason for refusing the reinstatement." 14 F.3d at 213 (alteration in original). Where a court concluded that voluntary departure should be reinstated, "the period for voluntary departure granted by the BIA begins to run anew from the date the mandate issues from the court of appeals reinstating the voluntary departure." *Id.* at 213 n. 8.

In reaching this conclusion, we relied in part upon the First Circuit's analysis in *Umanzor–Alvarado,* which offered two basic justifications for reinstating voluntary departure. First, the court expressed the concern that the INS might employ voluntary departure orders to keep aliens from prosecuting appeals from final orders of deportation. *See Umanzor–Alvarado,* 896 F.2d at 16. *Accord Kaczmarczyk,* 933 F.2d at 598. This concern reflected the fact that under pre-IIRIRA immigration law, a court of appeals lost jurisdiction of a petition for review once the alien left the United States. *See* 8 U.S.C. § 1105a(c) (1994). Second, the court noted that "nothing in the law … deprives [the court of appeals] of the legal power to order the appropriate remedy." *Umanzor–Alvarado,* 896 F.2d at 16.

The enactment of IIRIRA undercut both of these justifications for reinstatement of voluntary departure. Perhaps most fundamentally, IIRIRA repealed former § 1105a and replaced it with a new judicial review provision, 8 U.S.C. § 1252, that does not purport to cut off appellate jurisdiction once an alien leaves the country. *See Moore v. Ashcroft,* 251 F.3d 919, 922 (11th Cir.2001) ("Noticeably absent from the permanent rules is any similar language removing federal review jurisdiction in the event an alien departs or is removed."). Thus, an alien may continue to prosecute his appeal of a final order of removal even after he departs the United States, and there is no longer any prospect that the government could manipulate voluntary departure orders to deprive an alien of judicial review. *See Zazueta–Carrillo v. Ashcroft,* 322 F.3d 1166, 1171 (9th Cir.2003) (stating that "Congress's desire to expedite removal by voluntary assent now does not conflict with the alien's ability to pursue a petition for review"); *Tapia Garcia v. INS,* 237 F.3d 1216, 1217 (10th

9. Because Ngarurih was placed in removal proceedings after April 1, 1997, IIRIRA's permanent rules apply. *See Orquera v. Ashcroft,* 357 F.3d 413, 418 n. 1 (4th Cir.2003).

Cir.2001) (stating that "deportation no longer forecloses judicial review").

■ IIRIRA also changed the rules concerning judicial review of voluntary departure decisions. Section 1229c specifically precludes review of a denial of a request for voluntary departure. 8 U.S.C. § 1229c(f). Likewise, the general judicial review provision precludes review of orders granting voluntary departure:

> Notwithstanding any other provision of law, no court shall have jurisdiction to review—
>
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, *1229c*, or 1255 of this title....

*Id.* § 1252(a)(2)(B) (emphasis added). Thus, it is no longer true that "nothing in the law ... deprives [the court of appeals] of the legal power" to reinstate voluntary departure. *Umanzor–Alvarado,* 896 F.2d at 16. These intervening changes in the statute make *Ramsay* inapplicable to this, or any, permanent rules case.[10]

This conclusion is consistent with Congress' expressed intention to preserve the exercise of executive discretion in granting voluntary departures. Under current law, the decision whether to permit an alien to depart the United States voluntarily is committed entirely to the discretion of the Attorney General. 8 U.S.C. § 1229c(b)(1). By regulation, the Attorney General has permitted the INS district director, in the exercise of discretion, to extend the period

initially prescribed for voluntary departure. 8 C.F.R. § 240.26. As the Ninth Circuit has recognized, "it is executive rather than judicial officers who decide when an alien must depart," and "[n]either the statute nor the regulations give courts any designated role in this process of setting the deadline for departure." *Zazueta–Carrillo,* 322 F.3d at 1172.

The BIA gave Ngarurih thirty days from the date of its order—until February 7, 2003—to depart the country voluntarily. That deadline has long since passed, and Ngarurih has even exhausted the maximum period permitted by the statute. *See* 8 U.S.C. § 1229c(b)(2) (providing that the period for voluntary departure cannot exceed sixty days). "For us to specify in effect a different period starting more than a year later would contravene Congress's scheme and invade the executive branch's authority to specify a deadline for voluntary departure." *Zazueta–Carrillo,* 322 F.3d at 1172–73. Because the statute plainly precludes our review of the BIA's order granting voluntary departure, we hold that a court of appeals lacks jurisdiction to entertain a request to reinstate voluntary departure.[11]

Relying upon recent decisions from the Sixth and Ninth Circuits, Ngarurih further contends that we should exercise our general equitable power, pursuant to 28 U.S.C. § 2349, to stay the period specified for voluntary departure. These decisions

---

**10.** Of course, *Ramsay* remains applicable to cases not governed by IIRIRA's permanent rules, *i.e.,* cases in which removal proceedings were commenced before April 1, 1997.

**11.** We are aware that the First Circuit continues to reinstate voluntary departures even in cases decided under IIRIRA's permanent rules. *See, e.g., Velasquez v. Ashcroft,* 342 F.3d 55, 59 (1st Cir.2003); *Khalil v. Ashcroft,* 337 F.3d 50, 56 (1st Cir.2003). Citing *Velasquez,* the Sixth Circuit reinstated voluntary departure in *Loulou v. Ashcroft,* 354 F.3d 706,

710 (8th Cir.2003). Unfortunately, neither the First Circuit nor the Sixth Circuit has offered any reasoned justification for continuing this practice in permanent rules cases. The First Circuit relies upon pre-IIRIRA authorities for the proposition that reinstatement is permissible. *See Yatskin v. INS,* 255 F.3d 5, 11 (1st Cir.2001) (a permanent rules case citing *Alvarez–Flores v. INS,* 909 F.2d 1, 8 (1st Cir.1990), a pre-IIRIRA decision). We decline to follow this approach.

hold that an alien may obtain a stay of his voluntary departure period if he meets the requirements for a stay of removal. *See Nwakanma v. Ashcroft,* 352 F.3d 325, 327 (6th Cir.2003) (*per curiam*); *El Himri v. Ashcroft,* 344 F.3d 1261, 1262 (9th Cir. 2003). Having concluded, however, that 8 U.S.C. § 1252(a)(2)(B) precludes judicial review of the BIA's order granting voluntary departure, we cannot evade this statutory directive by resort to equity. Indeed, since we lack jurisdiction over the BIA's order granting voluntary departure, there is nothing before us to stay.

It is not enough to say that we have jurisdiction over the order of removal. That fact gives us only the prerogative to apply equitable remedies to *that* order. Thus, we are free to grant a stay of removal when the alien satisfies the statutory requirements for such relief. *See* 8 U.S.C. § 1252(f)(2). We are not free to grant additional relief with respect to a voluntary departure order that even the dissent agrees is not properly before us.

Rather than explain how a court can operate on an order not properly before it, the dissent argues that appellate review is "meaningless" for asylum applicants who "are forced to return to countries where they may be killed or imprisoned and thus unable to return to the United States if we determine that they are entitled to asylum." *Post* at 197–98. *See also Nwakanma,* 352 F.3d at 326; *Zazueta–Carrillo,* 322 F.3d at 1177 (Berzon, J., concurring). This is not so much an objection to review procedures concerning voluntary departure as it is an objection to the procedures for appellate review of immigration cases generally. Absent a stay of removal, an alien in an ordinary immigration appeal

may be removed to his home country even before his appeal is decided. Even in that case, there is a possibility that the alien will face persecution in the home country rendering him unable to return should he prevail on appeal. The remedy for this concern is the stay of removal, which we retain the option to grant in any case where the alien satisfies the statutory requirements. This relief is just as available to the alien who sought voluntary departure as it is to the alien who did not.

In essence, the dissent contends that an alien with a meritorious asylum claim should be permitted to take the benefits of voluntary departure without bearing any of the costs. *See post* at 198–99 (arguing that "we should not force aliens with possibly meritorious asylum appeals to choose between preserving certain benefits made available under the INA and their safety"). This contention cannot be reconciled with the voluntary departure scheme described in the statute. This statutory scheme reveals Congress' intention to offer an alien a specific benefit—exemption from the ordinary bars on subsequent relief—in return for a quick departure at no cost to the government. So important was the quick-departure aspect of this bargain that Congress provided for certain penalties to attach when an alien overstays his voluntary departure period. *See* 8 U.S.C. § 1229c(d). Thus, an alien considering voluntary departure must decide whether an exemption from the ordinary bars on subsequent relief is worth the cost of returning to the home country within the period specified. Having made his election, however, the alien takes all the benefits and all the burdens of the statute together.[12]

---

12. Contrary to the dissent's suggestion, voluntary departure is, from beginning to end, voluntary. The alien must request the relief; it is not offered as a matter of course. *See* 8

C.F.R. § 240.25(c). Even if he requests the relief and obtains it, the alien may later reject it by overstaying the period specified for departure. If he rejects voluntary departure in

Under the dissent's view, an alien could request voluntary departure, overstay the specified period and deprive the government of a quick departure, wait out the appellate review process, and then demand the full benefits of voluntary departure. This scenario is not at all what Congress intended, and it is not for us to recalibrate the scheme that Congress created in the manner that the dissent now urges. The voluntary departure order is not properly before us, as Congress has insulated that order from appellate review. We are not at liberty to apply equitable remedies to that order, certainly not in a way that contravenes the statutory scheme. *Cf. INS v. Pangilinan,* 486 U.S. 875, 883, 108 S.Ct. 2210, 100 L.Ed.2d 882 (1988) (stating that "courts of equity can no more disregard statutory ... requirements and provisions than can courts of law").[13]

## III.

Congress has reposed broad authority in the Attorney General to adjudicate individual immigration cases, and Congress has expressly protected this executive discretion by restricting appellate jurisdiction and constructing deferential standards of review. The BIA ruled that Ngarurih's claim to asylum was not powerful enough to warrant the extraordinary relief of asy-lum. That ruling is supported by substantial evidence and applicable law, and it must be affirmed. The BIA also granted Ngarurih thirty days within which to depart the United States voluntarily. Because Congress left it to executive officers, not this court, to determine how long an alien should have to exercise voluntary departure, we cannot reinstate voluntary departure or otherwise alter the BIA's order in this respect. For all of these reasons, the petition for review is hereby

*DENIED.*

GREGORY, Circuit Judge, concurring in part and dissenting in part:

For the reasons that follow, I concur in the majority's conclusion that substantial evidence supports the Board of Immigration Appeal's ("BIA") denial of Ngarurih's application for asylum and that the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") divests us of jurisdiction to reinstate Ngarurih's voluntary departure period. However, while I believe that Ngagurih is not entitled to a stay of voluntary departure, I respectfully dissent from the majority's far reaching, and in my view unnecessary, conclusion that the IIRIRA precludes us from exercising our general equitable powers to stay or toll a voluntary departure

---

this manner, then he is subject to removal from the United States in the ordinary course. The fact that his choice carries real consequences—a monetary penalty and subjection to the ordinary bars on subsequent relief—means that the alien has a real choice to make, not that he is, as the dissent says, "forced" to leave. *Post* at 198–99.

13. Even assuming that *Nwakanma* and *El Himri* correctly state the law, Ngarurih would not be entitled to a stay of voluntary departure because he cannot satisfy the requirements for a stay of removal. Under the statute, a court of appeals may enjoin a removal only if "the alien shows by clear and convincing evidence that the entry or execution of

[the order of removal] is prohibited as a matter of law." 8 U.S.C. § 1252(f)(2). We have already concluded that Ngarurih is not entitled to asylum, so his removal is not prohibited as a matter of law. Moreover, Ngarurih's request for a stay of voluntary departure was made after the 30–day period for voluntary departure had already expired; neither *Nwakanma* nor *El Himri* purports to authorize a stay in such a circumstance. *See Nwakanma,* 352 F.3d at 327 (noting that the alien moved for a stay on the last day before his voluntary departure period expired); *El Himri,* 344 F.3d at 1263 n. 2 (expressly reserving the question whether a court of appeals can stay a departure period that had already expired).

period. As the Sixth and Ninth Circuits, I do not believe that the IIRIRA precludes us from staying a voluntary departure period pending our resolution of an asylum appeal provided that the merits of such appeal justify a stay of the removal order. *Nwakanma v. Ashcroft*, 352 F.3d 325, 326 (6th Cir.2003)(*per curiam*)(holding that the IIRIRA does not bar federal appellate courts from staying a voluntary departure period and thus concluding that "[a] stay of voluntary departure pending appellate review should ... be available on the same showing that authorizes a stay of removal pending review"); *El Himri v. Ashcroft*, 344 F.3d 1261, 1262 (9th Cir. 2003)("[W]e hold that [post-IIRIRA] this court retains equitable jurisdiction to stay the voluntary departure period ... [and] that the standards for obtaining a stay of removal shall also apply to stays of voluntary departure."). Without the ability to maintain the status quo by staying a voluntary departure period, our review of asylum appeals will be rendered meaningless because the alien will already have been subjected to the harm from which our decision is supposed to protect him or her. If that harm comes in the form of death, imprisonment or the inability to depart their native country, our determination that an alien is entitled to asylum is meaningless because the alien will be unable to return to the United States and thus give effect to our decision. In the instances in which aliens avail themselves of a voluntary departure and no harm results therefrom, we will be factually forced to conclude that the alien does not have a well-founded fear of persecution. Thus, our appellate review will be rendered a mere formality in the asylum application process.

## I.

The BIA denied Ngarurih's application for political asylum because "his return to Kenya for 2 months in 1997 ... constitute[d] a fundamental change in circumstances and diminishe [d] his claim to have a well-founded fear of future persecution." J.A. 319. Like the majority, I believe substantial evidence supports this conclusion. During his two month return to Kenya, Ngarurih was publicly involved in his younger brother's criminal appeal, submitting court documents bearing his signature, traveling to various villages in Kenya to investigate the facts of his brother's case and posting his brother's bond. Despite being publicly active in his brother's criminal appeal, Ngarurih, whose presence government officials were aware of, was not subjected to any attacks, bodily harm, threats or other coercive measures during his two month stay in Kenya.* Indeed, government officials did not even attempt to impede Ngarurih's efforts to assist with his brother's appeal and release from prison. Moreover, Ngarurih has not brought to our attention any events that have occurred subsequent to his 1997 trip that would cause him to have a well-founded fear of persecution if he were to return to Kenya.

The BIA also denied Ngarurih's application for "humanitarian asylum" on the basis that "his willing return to Kenya undermine[d] his claim to have 'compelling reasons for being *unwilling* or unable to return' such that asylum [was] warranted, even in the absence of a well-founded fear." *Id.* (quoting 8 C.F.R. § 208.12(b)(1)(iii)(emphasis added)). Unlike the majority, I believe that the BIA incorrectly determined that Ngarurih "willing-

---

* I also note that Ngarurih's family did not experience any form of persecution during his two month stay in Kenya.

ly" returned to Kenya. Ngarurih only returned to Kenya after being informed that his younger brother—whom he reared as a son prior to entering the United States—had been falsely accused of raping their niece and forced to enter a guilty plea. Having being tortured in a Kenyan prison himself, Ngarurih understandably felt compelled to assist his brother, whom he viewed more like a son, in appealing what he believed to be an unjust conviction even if doing so required him to place his life in danger by returning to Kenya. Under such circumstances, I do not believe that Ngarurih's trip to Kenya can be considered one that was taken "willingly." Nonetheless, like the majority, I am unable to find that the BIA's denial of Ngarurih's application for "humanitarian asylum" is manifestly contrary to the law or an abuse of discretion given that "humanitarian asylum" has been limited to extreme cases, such as that "of the German Jews, the victims of the Chinese 'Cultural Revolution,' [and] survivors of the Cambodian genocide." *Bucur v. INS*, 109 F.3d 399, 405 (7th Cir.1997)(internal citation omitted).

## II.

The majority concludes that the IIRIRA precludes us from both reinstating and staying Ngarurih's voluntary departure period. While I agree that the IIRIRA divests us of jurisdiction to reinstate Ngarurih's voluntary departure period, I do not believe that the IIRIRA precludes us from staying Ngarurih's voluntary departure period. Rather, I simply believe that Ngarurih is not entitled to a stay of his voluntary departure period because he is unable to satisfy the requirements for a stay of removal.

The IIRIRA provides that "[n]o court shall have jurisdiction over an appeal from [the] denial of a request for an order of voluntary departure ... nor shall any court order a stay of an alien's removal pending consideration of any claims with respect to voluntary departure." 8 U.S.C. § 1229c(f). The IIRIRA further provides that "[n]otwithstanding any other provision of law, no court shall have jurisdiction to review ... any judgment regarding the granting of relief under section ... 1229c [voluntary departure] of this title." *Id.* § 1252(a)(2)(B)(i). Based on these provisions, I concur in the majority's conclusion that the IIRIRA precludes us from reinstating Ngarurih's voluntary departure period. These provisions make clear Congress's intent to divest federal appellate courts of jurisdiction to determine whether aliens are entitled to the discretionary relief of voluntary departure. Given that we no longer have jurisdiction to review the BIA's grant or denial of voluntary departure, I do not believe we have the authority to reinstate the BIA's voluntary departure determinations.

I do not, however, believe that these provisions preclude us from exercising our equitable jurisdiction to stay a voluntary departure period pending our resolution of an asylum appeal. The provision relied upon by the majority to reach this conclusion—8 U.S.C. § 1252(a)(2)(B)(i)—only precludes us from reviewing the merits of the BIA's decision to grant voluntary departure. As the Sixth Circuit recently held: "[I]n granting a stay of voluntary departure, we do not pass on the substance of the decision to grant voluntary departure; we only stay the immediate effectiveness of the relief already granted by [the BIA] in [its] discretion, to allow the alien petitioner to receive appellate review." *Nwakanma*, 352 F.3d at 326. Consequently, by granting a stay of voluntary departure we do not "evade," as the majority concludes, the statutory mandate of 8 U.S.C. § 1252(a)(2)(B)(i)—"no court

shall have jurisdiction to review ... any judgment regarding the granting of relief under section ... 1229c [voluntary departure]"—by resort to equity. Rather, we ensure, by maintaining the status quo, that our decisions rendered in asylum appeals, appeals over which we clearly have jurisdiction, are not rendered meaningless. As the Ninth and Sixth Circuits have noted, asylum appeals will in effect be rendered meaningless if individuals that have fled their native lands based on well-founded fears of persecution are forced to return to countries where they may be killed or imprisoned and thus unable to return to the United States if we determine that they are entitled to asylum. *Nwakanma,* 352 F.3d at 326 ("Asylum applicants with potentially meritorious cases establishing their genuine fear of persecution in their home countries will face either returning to those countries and possibly life-threatening persecution or staying in the United States, letting the clock run out on their voluntary departure periods, and suffering the penalties that attach."); *Zazueta–Carrillo v. Ashcroft,* 322 F.3d 1166, 1177 (9th Cir.2003)(Berzon, J., concurring)("Without our equitable authority to stay the availability of voluntary departure periods, at the time an alien is granted voluntary departure he or she would be faced with having to leave forthwith to preserve the benefits of voluntary departure, risking nonreturn in spite of a potentially meritorious case ... [thus] in effect void[ing] the asylum appeal.").

Further undermining the majority's conclusion is the fact that the IIRIRA only limits our authority to stay BIA orders so as to allow for the consideration of claims pertaining to voluntary departure. Specifically, the IIRIRA provides that "[n]o court shall ... order a stay of an alien's removal pending consideration of any claims with respect to voluntary departure." 8 U.S.C. § 1229c(f). Consequently,

the IIRIRA "only prohibits stays of removal pending consideration of voluntary departure claims, not the opposite, stays of granted periods of voluntary departure pending consideration of removal orders." *Zazueta–Carrillo,* 322 F.3d at 1176 (Berzon, J., concurring). The fact "[t]hat certain kinds of stays pertaining to voluntary departure orders are prohibited but not others is, under the case law interpreting the IIRIRA, a strong indication that, except as limited by the statute, we retain our traditional equitable power to issue stays preserving the status quo." *Id.; see Reno v. American–Arab Anti–Discrimination Comm.,* 525 U.S. 471, 482, 487, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999)(narrowly construing section 1252(g) of the IIRIRA); *Andreiu v. Ashcroft,* 253 F.3d 477, 481–82 (9th Cir.2001)(*en banc*)(narrowly construing section 1252(f) of the IIRIRA).

In addition to not being supported by the IIRIRA's text, the result that follows from the majority's conclusion counsels against it. Under the majority's conclusion, an alien denied voluntary departure, but who meets the standard for a stay of removal, can obtain equitable relief and thus remain in this country while pursuing his appeal whereas an alien granted the benefit of voluntary departure must leave the country while seeking judicial review. Some may argue that this is the price that aliens who voluntarily depart pay in return for the benefit of not being barred from obtaining relief under the Immigration and Naturalization Act ("INA") for a period of ten years, as are aliens removed involuntarily. This, however, is a policy decision best left to Congress. Thus, absent clear statutory language, which I do not find in the IIRIRA, we should not force aliens with possibly meritorious asylum appeals to choose between preserving certain benefits made available under the INA and their safety. Moreover, such reasoning

fails to recognize that aliens with well-founded fears of persecution will be unable to take advantage of the benefits conferred by voluntary departure if they are killed or imprisoned upon returning to their native country.