In the

# United States Court of Appeals

## For the Seventh Circuit
_____

No. 07-1020

ARKADIY L. KHOLYAVSKIY,

*Petitioner*,

*v.*

MICHAEL B. MUKASEY, Attorney
General of the United States,

*Respondent*.

_____

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A71-093-229

_____

ARGUED JANUARY 8, 2008—DECIDED AUGUST 28, 2008

_____


Before FLAUM, RIPPLE and MANION, *Circuit Judges*.

RIPPLE, *Circuit Judge.* Arkadiy Kholyavskiy, a native
of the former Soviet Union, petitions for review of an order
of the Board of Immigration Appeals ("BIA") denying
him asylum, withholding of removal and relief under the
Convention Against Torture ("CAT"). For the reasons
set forth in this opinion, we grant the petition in part,
deny it in part, and remand for further proceedings.

# I

# BACKGROUND

## A. Facts

Mr. Kholyavskiy was born in 1977 in Moscow, in the former Soviet Union. Mr. Kholyavskiy is Jewish, and he began to experience harassment as a result of his religion and ethnicity when he started school in 1984. According to Mr. Kholyavskiy, each quarter, he was required to stand in front of his class and state his ethnicity; as a result, students would laugh at him and refer to him as a "kike." A.R. at 645-48. Mr. Kholyavskiy suffered additional humiliations at the hands of his fellow students. On more than one occasion, other students urinated on him. Additionally, when he was in the second grade, older students forced him into a bathroom, pulled down his pants and laughed at him, commenting on the fact that he was circumcised. His parents attempted to address the situation with school officials; the response of the school's director was that the stories "could not have been true" and "that the Jewish child [wa]s just making things up." A.R. at 811.

Mr. Kholyavskiy was mistreated by neighborhood children as well. Mr. Kholyavskiy's mother, Irina, stated that, when he would leave the family apartment, other children would torment him; they would laugh at him, call him names and take or destroy toys and games that he brought outside. Irina Kholyavskiy also testified to a beating by one of Mr. Kholyavskiy's schoolmates that resulted in a broken arm. Irina stated that she became afraid to let Mr. Kholyavskiy play outside.

Both Mr. Kholyavskiy and his mother recounted another incident that resulted in physical injury. They testified that a classmate in the neighborhood called Mr. Kholyavskiy a "kike" and had her German shepherd attack him. Soviet police would not assist in the effort to locate the dog. As a result of the attack, Mr. Kholyavskiy had to undergo a series of forty rabies shots. Subsequently, he became extremely scared of being beaten and harmed; he dropped out of school and began hiding in the attic of his family's apartment.

In addition to actions directed specifically at Mr. Kholyavskiy, there also were threats and harassment targeted at Mr. Kholyavskiy's entire family. In 1991 and 1992, Mr. Kholyavskiy's family received several telephone calls during which the caller informed them that the "Crystal Night" or pogrom was coming. A.R. at 924.[1] As well, Stars of David were scratched into his family's apartment mailbox. A.R. at 926.

In 1992, Mr. Kholyavskiy's family was granted refugee status[2] by the United States Embassy in Moscow; Mr. Kholyavskiy was fifteen at the time. The Kholyavskiy family moved to the United States, and, in January 1995,

---

[1] Presumably, the caller was referencing the 1938 "*Kristallnacht*, a pogrom throughout Germany in which the Nazis destroyed synagogues and Jewish-owned homes and property, as well as arbitrarily arrested thousands of Jews." *Schellong v. U.S. INS*, 805 F.2d 655, 661 (7th Cir. 1986).

[2] Mr. Kholyavskiy's parents had applied for refugee status in 1989.

Mr. Kholyavskiy's status was adjusted to that of a lawful permanent resident. Later that year, Mr. Kholyavskiy graduated from high school.

However, Mr. Kholyavskiy continued to suffer the emotional effects of his experiences in the former Soviet Union. Prior to leaving the Soviet Union, Mr. Kholyavskiy began to fear encounters with other people. By the time he was sixteen, he was experiencing panic attacks. Since 2001,[3] he has been under the care of Dr. Donald Jacobson, a board certified psychiatrist, who diagnosed Mr. Kholyavskiy with severe social anxiety disorder and depression.

Approximately one year after Mr. Kholyavskiy began experiencing his panic attacks, he had his first run-in with the law. Over the next few years, Mr. Kholyavskiy's record reveals the following criminal activity: trespassing, retail theft (two separate incidents), harassment, battery (two incidents), burglary and unlawful possession of counterfeit prescription forms. Mr. Kholyavskiy's criminal record led to the commencement of removal proceedings against him in May 2001.

## B. Administrative Proceedings

### 1.

A merits hearing was conducted before an Immigration

---

[3] Mr. Kholyavskiy first started seeking medical treatment for his problems in 1996.

Judge ("IJ") in December 2004.[4] At that hearing, Mr. Kholyavskiy called Dr. Ronald Wixman, a professor from the University of Oregon, to testify. Despite Dr. Wixman's extensive credentials, the IJ believed that Dr. Wixman was biased in favor of Jewish emigration to the United States; as a result, the IJ refused to recognize Dr. Wixman as an expert witness on ethnic groups in Russia or on any other topic. Nevertheless, the IJ allowed Dr. Wixman to testify with respect to the "propiska" system[5] and the recent rise of nationalism, anti-Semitism and anti-Westernism in Russia.

After Dr. Wixman had testified, but before Mr. Kholyavskiy could be called as a witness, Mr. Kholyavskiy suffered an acute psychotic breakdown. Dr. Jacobson was present and declared Mr. Kholyavskiy legally incompetent. The IJ continued Mr. Kholyavskiy's merits hearing until January 5, 2005. In the interim, Mr. Kholyavskiy was transferred from the custody of the Department of Homeland Security to a mental health facility.

---

[4] Mr. Kholyavskiy previously had been found removable by an IJ. He appealed the decision, which was affirmed by the Board of Immigration Appeals. Later, Mr. Kholyavskiy moved to reopen proceedings on the ground that his prior counsel had been ineffective. The Board granted the motion to reopen. The merits hearing described above followed the reopening of proceedings by the Board.

[5] A propiska, or resident permit, was a document required in the former Soviet Union to obtain housing and other government benefits in a particular locality. Dr. Wixman testified that, although officially outlawed, the use of the propiska system continues.

At the continued hearing on January 5, 2005, Mr. Kholyavskiy testified to the incidents of abuse that he suffered at the hands of his classmates and neighbors. He also detailed the history of his mental illness, as well as his run-ins with the law. Mr. Kholyavskiy expressed his fears at the possibility of returning to Russia. He believed that, as a Jew, he would be attacked with impunity. He did not believe that he would be able to obtain a "propiska" and, therefore, would have to live on the street. Finally, he feared that he would not be able to obtain the medications necessary to control his disorder. In response to the question whether Mr. Kholyavskiy wanted to return to Russia, he stated:

> I'll die in Russia it's impossible. It's impossible. I have no money; I have nothing there who will take care of me? If I, if I turn to the police for help they will put me in jail and then I won't be able to get any medication. I won't have any medication there. I can't even imagine I'm just again didn't think about that.

A.R. at 751.

At the final stage of the hearing in February 2005, Mr. Kholyavskiy called Dr. Jacobson as a witness. Dr. Jacobson stated that he had treated Mr. Kholyavskiy since 2001, that he suffered from social anxiety disorder, and that it had taken some time to determine the combination of medications that would control most effectively Mr. Kholyavskiy's symptoms. He further stated that, for approximately two years, Mr. Kholyavskiy had been on Paxil and Klonopin, drugs that were not available in Russia. In addition to depriving him of his medication, Dr. Jacobson

believed that removal to Russia would be devastating to Mr. Kholyavskiy because he would be incapable of taking care of his day-to-day needs. Indeed, Dr. Jacobson believed that Mr. Kholyavskiy would suffer an acute psychotic breakdown if he were separated from his family. *See* A.R. at 756-57.[6] Finally, Dr. Jacobson testified that he was aware of Mr. Kholyavskiy's criminal history. However, Dr. Jacobson did not believe that Mr. Kholyavskiy was capable of intentional violence or that he was a danger to his family or to the community.

Mr. Kholyavskiy's mother, Irina, also testified on his behalf. She stated that, while living in Russia, Mr. Kholyavskiy consistently was mocked and beaten by other children because he was a Jew. A.R. at 812. Irina Kholyavskiy also corroborated Dr. Jacobson's testimony regarding her son's inability to live on his own.

**2.**

Approximately one month after the hearing concluded, the IJ issued a written opinion.[7] After reviewing the

---

[6] Dr. Jacobson stated: "I think if he did not have the support of his family and was off both the Paxil and the Klonopin I think he would have a very difficult time maintaining his sanity." A.R. at 793.

[7] The IJ first disposed of the Government's claim that Mr. Kholyavskiy was statutorily ineligible for asylum and withholding of removal because he had committed a particularly

(continued...)

evidence presented, the IJ found that Mr. Kholyavskiy had testified credibly, but that "his fears of future mistreatment in Russia [we]re based on exaggerations and misinformation." A.R. at 473. Concerning the other witnesses, the IJ commented:

> Similarly, the respondent's mother, Irina Kholyavskiy, impressed the Court with her obvious concern for her son and desire to assist him in any way she could. Furthermore, the Court finds the testimony of the remaining witnesses [sic] Dr. Donald Jacobson, to be credible. In contrast, Professor Wixman seemed to be an advocate for the respondent, and tried to fit any information into the mold of anti-Semitism, without endeavoring to make an objective judgment.

*Id.* at 474.

Turning to Mr. Kholyavskiy's asylum claim, the IJ determined that Mr. Kholyavskiy's status as a refugee when he arrived in 1992 did not continue in perpetuity, but ended when he was granted lawful permanent resident status. Consequently, the IJ concluded that he was not entitled to a presumption that he would suffer persecution if returned to Russia. Apart from his previous refugee status, the IJ found that Mr. Kholyavskiy had not suffered

---

[7] (...continued)

serious crime. The IJ determined that none of the crimes for which Mr. Kholyavskiy had been convicted fell into that category; consequently, he was not statutorily ineligible for relief on that basis. *See* 8 U.S.C. §§ 1158(b)(2)(A)(ii) & 1231(b)(3)(B)(ii).

past persecution. The IJ observed that, "although the respondent felt humiliated by having his pants pulled down in the bathroom by older students who called him derogatory names, this incident does not rise to the level of persecution." *Id.* at 475. Additionally, the court stated that, although it did not want to "downplay the respondent's mistreatment," it did not believe that "a single isolated incident of violence where the respondent was assaulted by a dog owned by an adolescent and subsequently required rabies shots" constituted persecution. *Id.*[8]

Additionally, the IJ determined that Mr. Kholyavskiy was not likely to suffer future persecution based on any other protected status. Specifically, Mr. Kholyavskiy's mental illness did not render him a member of a "particular social group" because his "illness is not immutable." *Id.* at 477. Furthermore, the IJ determined that Mr. Kholyavskiy's fear of mistreatment on the basis of his Jewish identity was not objectively reasonable because, inter alia, anti-Semitism had been "officially condemned" by then-Russian President Vladmir Putin. *Id.* at 478.[9]

---

[8] Similarly, the IJ determined that Mr. Kholyavskiy did not qualify for a grant of humanitarian asylum. According to the IJ, Mr. Kholyavskiy's mistreatment "is simply not one of the extreme cases" for which humanitarian asylum is appropriate. A.R. at 479 (citing *Bucur v. INS*, 109 F.3d 399, 404-06 (7th Cir. 1997)).

[9] The IJ did state that "the Court is sensitive to the fact that there are anti-Semitic groups in Russia, a fact that the respondent has amply documented." A.R. at 478.

Finally, the IJ determined that, even if Mr. Kholyavskiy had qualified for asylum, in the exercise of discretion, he would have denied Mr. Kholyavskiy's application. The court stated that "it has become clear that the respondent's fear of returning to Russia is rooted in his mental illness and the possibility of being separated from his family rather than his Jewish identity, and the Court is sympathetic to the respondent's circumstances." *Id.* at 480. The IJ continued:

> Notwithstanding, the respondent's mental illness and the difficult circumstances both he and his family face if he is returned to Russia, his claim for asylum is extremely weak in several regards. The first is that his claim of past persecution is grounded on incidents which occurred long before he departed Russia and while he was the subject of an openly anti-Semitic Soviet Union which has long since expired. While troubling, the incidents upon which the respondent relies simply do not rise to the level of persecution. The second weakness to his claim centers around the complete absence of documentary evidence supporting the proposition that Jews are systematically targeted for persecution. The respondent has never held himself out as being Jewish and his claim that he will be recognized as Jewish because of his physical appearance or that he is destined to become homeless because he will be unable to find housing because of his mental illness and because he is Jewish are self serving and simply unsupported by the record. In short, the respondent's case is based on a profusion of arguments based on "worst case scenarios" that are

> unsupported by the evidence. Additionally, there is nothing preventing the respondent's family from mailing his medication to him and making arrangements to ensure that he is cared for.

*Id.* Finally, the court noted that Mr. Kholyavskiy did not come before the court with a "clean slate." *Id.* Although the court noted that "the respondent's crime must be kept in perspective and not inflated so as to suggest either that he is a nascent terrorist or a career criminal," the court determined that the crimes that he had committed "illustrate that the respondent is a man who repeatedly engages in inconsistent and erratic behavior," which could not be attributed entirely to his mental illness. *Id.*[10]

Mr. Kholyavskiy appealed to the BIA.

### 3.

The BIA affirmed the decision of the IJ. It believed that the IJ correctly had found that Mr. Kholyavskiy was "ineligible for asylum and withholding of removal as he failed to demonstrate either past persecution or a well-founded fear of future persecution." A.R. at 323. Like the IJ, the BIA found that, with respect to future persecution, Mr. Kholyavskiy had not established that his fear of future persecution based on his Jewish ethnicity, his mental illness or his status as a returning refugee from the United

---

[10] Having failed to establish eligibility for asylum, the IJ also determined that Mr. Kholyavskiy was not entitled to withholding of removal or relief under the CAT.

States was objectively reasonable. *Id.* Additionally, the BIA agreed with the IJ that, upon his adjustment of status to lawful permanent resident, Mr. Kholyavskiy had "relinquished his refugee status." *Id.* Finally, the BIA rejected Mr. Kholyavskiy's contention that the IJ had denied him a fair hearing by limiting the testimony of Dr. Wixman. The BIA concluded that the IJ had "adhered to the role of impartiality assigned to him as one acting in a judicial or quasi-judicial capacity." *Id.* at 324.

Mr. Kholyavskiy timely petitioned for review. After a briefing schedule had been set, the Government "move[d] to remand this petition for review to the Board of Immigration Appeals . . . for further proceedings and consideration of Petitioner's claims that he is a member of a protected social group under the Immigration and Nationality Act, and that because of his prior grant of refugee status under 8 U.S.C. § 1157, a legal presumption should have been applied to his claims for asylum and withholding of removal." *Kholyavskiy v. Gonzales*, No. 05-3775, Motion to Remand at 1. We granted the Government's motion.

**4.**

On remand, the BIA first noted that it previously had "determined that membership in a particular social group refers to membership in a group of people all of whom share a common, immutable characteristic, namely, a characteristic that is either beyond the power of the individual members to change, or that is so fundamental to their identities or consciences that it should not be required to be changed." A.R. at 2. The BIA then went on

to evaluate Mr. Kholyavskiy's membership in a number of possible social groups.

Turning first to Mr. Kholyavskiy's mental illness, the BIA initially noted that "the IJ in this case previously determined that the respondent's mental illness does not qualify as a cognizable particular social group because such a trait is not immutable." *Id.* at 3. The BIA "agree[d]" with these findings and further found that "respondent has failed to illustrate any error in the Immigration Judge's analysis of his purported social group in this regard." *Id.* The BIA similarly agreed with the IJ that criminal deportees did not meet the definition of a particular social group. With respect to Jewish refugees who have been resettled in the United States, and presuming the immutability of Mr. Kholyavskiy's experiences in this regard, the BIA did "not find that these characteristics are the kind of shared past experiences that constitute membership in a particular social group." *Id.*

The BIA acknowledged that Mr. Kholyavskiy's familial status and Jewish background could place him in a protected category. However, it found that Mr. Kholyavskiy had "failed to demonstrate a well-founded fear of persecution on account of either of these social groups." *Id.* at 4. Specifically, the IJ stated that, "[a]lthough the respondent cites to news reports that confirm the existence of generalized discrimination against Jews, in addition to occasional violence, he has not shown that the threats directed toward Jews are increasing or that the government fails to investigate and charge the perpetrators of such attacks." *Id.* at 5.

Finally, the BIA turned to the question of whether, given Mr. Kholyavskiy's past refugee status, he was entitled to a presumption of future persecution. The BIA noted that there was not any controlling Seventh Circuit case law holding that, once a refugee adjusted his status to that of a permanent resident, he also maintained his refugee status. However, the Third Circuit had addressed the issue and determined that refugee status did not survive the adjustment of status. *See id.* at 6 (citing *Romanishyn v. Attorney General*, 455 F.3d 175, 179 (3d Cir. 2006)). Furthermore, the Board observed that its holding was consistent with that of *Matter of Smriko*, 23 I. & N. Dec. 836 (BIA 2005), in which the BIA had held that an alien, who had adjusted his status to that of a lawful permanent resident, could be placed in removal proceedings without the termination of refugee status as a precondition to removal. *See id.* at 8.

In sum, the BIA held that Mr. Kholyavskiy had not suffered past persecution and was not likely to suffer future persecution on any protected basis. Again, Mr. Kholyavskiy timely petitioned for review in this court.

## II

### DISCUSSION

Mr. Kholyavskiy challenges several aspects of the BIA's decision. First, Mr. Kholyavskiy maintains that the BIA erred in holding that he was provided a fair opportunity to present his evidence. He also maintains that the BIA erred in failing to afford him a statutory presumption of

refugee status. He further argues that the BIA's determination with respect to past persecution is not supported by substantial evidence. He contends that the BIA erred when it failed to recognize that he belonged to several protected social groups and that he would suffer future persecution based on his membership in those groups and based on his Jewish identity. Finally, Mr. Kholyavskiy maintains that the BIA failed to recognize his eligibility for a grant of asylum based on humanitarian concerns. We evaluate Mr. Kholyavskiy's arguments below.

**A.**

Mr. Kholyavskiy first maintains that he was denied a fair hearing before the IJ. Although Mr. Kholyavskiy couches his argument in constitutional terms, we have held that the immigration laws and their implementing regulations governing removal proceedings afford the alien all the rights to which he is entitled under the due process clause. *Apouviepseakoda v. Gonzales*, 475 F.3d 881, 885 (7th Cir. 2007). Therefore, the correct inquiry is whether Mr. Kholyavskiy was provided with a "reasonable opportunity" to present evidence on his own behalf as guaranteed by 8 U.S.C. § 1229a(b)(4)(B).

Mr. Kholyavskiy argues that the IJ failed to afford him a reasonable opportunity to present evidence in three ways: (1) by failing to recognize Dr. Wixman as an expert on the treatment of Jews and the mentally ill in Russia, (2) by failing to admit all of the evidence submitted in support of Mr. Kholyavskiy's motion to reopen, and (3) by interjecting himself into the proceedings in a way that exacerbated Mr. Kholyavskiy's mental illness.

### 1. Dr. Wixman's Testimony

With respect to Dr. Wixman's testimony, Mr. Kholyavskiy takes issue with the IJ's failure to recognize Dr. Wixman as an expert. According to Mr. Kholyavskiy, Dr. Wixman "has the knowledge, skill[,] experience, training and education to be qualified as an expert witness who could assist the IJ in determining what would happen to Mr. Kholyavskiy as a Jew, a Jewish refugee to the U.S., and a mentally ill person, if he were returned to Russia." Appellant's Br. at 22.

Although Mr. Kholyavskiy frames his argument in terms of admissibility of expert testimony under the Federal Rules of Evidence,[11] the Federal Rules of Evidence do not apply in immigration hearings. Instead, the IJ evaluates evidence to determine whether it is "probative and its admission fundamentally fair." *See Doumbia v. Gonzales*, 472 F.3d 957, 962 (7th Cir. 2007). The pivotal question in evaluating an IJ's evidentiary ruling is whether the ruling frustrated the alien's reasonable opportunity to

---

[11] Federal Rules of Evidence Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

present evidence on his own behalf. In this case, the IJ's failure to recognize Dr. Wixman as an expert did not impinge Mr. Kholyavskiy's right to a fair hearing.

With respect to Dr. Wixman's expertise concerning the treatment of the mentally ill in the former Soviet Union, Dr. Wixman stated in his affidavit that he was not an expert on mental disorders, but that he was "familiar with" Russian views and policies with respect to the mentally ill. Dr. Wixman, however, never has conducted any academic studies or research concerning the mentally ill in Russia. The only evidence he sought to offer with respect to this subject was anecdotal evidence acquired second- and third-hand. *See* A.R. at 607-09. Such evidence was of limited reliability and, consequently, had minimal probative value.

Turning to Dr. Wixman's expertise on the treatment of Russian Jews and Jewish refugees returning to Russia, Dr. Wixman stated in his affidavit: "I do not directly write on the Jews of Russia and the other republics . . . because I am Jewish with ancestors (grandparents) from Lithuania, Ukraine, Moldova, and Russia." A.R. at 1288. He did state, however, that he "keep[s] close watch on Jewish issues" in the post-Soviet republics. *Id*.[12] It would

---

[12] Although the Board noted that the IJ should not have assessed the possible bias of any witness prior to hearing his testimony, the Board "agree[d] with the Immigration Judge's conclusion that Dr. Wixman is not an expert witness on the treatment of the mentally ill in Russia or the treatment of returning Russians

(continued...)

appear, therefore, that Dr. Wixman himself acknowl-
edged that, from an academic standpoint, he was not an
expert in the treatment of Russian Jews, but simply an
individual who was interested in the subject matter.

Furthermore, although the IJ did not recognize Dr.
Wixman as an expert in the treatment of Russian Jews, he
did allow Dr. Wixman to testify extensively. Dr. Wixman's
testimony was curtailed only on two occasions. The first of
these was when Dr. Wixman was testifying as to anti-
Semitic events in Irkutsk. The IJ, at that point, interjected
and asked counsel to explain why events in Irkutsk, nearly
1500 miles from where Mr. Kholyavskiy had resided, were
relevant. Counsel, however, did not follow up with any
questions that established the relevance of any anti-Semitic
events in Irkutsk to Mr. Kholyavskiy. On the second
occasion, the IJ sustained the Government's objection to
Dr. Wixman's testimony concerning experimentation
conducted on individuals confined to institutions for the
mentally ill. According to Dr. Wixman, these statements
were not based on any studies of those institutions, any
personal interviews with inmates or his visits to such
facilities, but instead on information provided to him by
unidentified relatives of those housed in the facilities. *See*
A.R. at 608-10. Such evidence was of limited probative
value and trustworthiness, and the IJ was not required to

------

[12] (...continued)
from the United States given his limited expertise in these
subjects, in addition to the generalized and unsupported
assessments contained in his written statement." A.R. at 325.

consider it. *Cf. Alexandrov v. Gonzales*, 442 F.3d 395, 405 (6th Cir. 2006) (noting that the consideration of "[h]ighly unreliable hearsay" might raise due process concerns (internal quotation marks and citations omitted)).

## 2. Exclusion of Evidence

Mr. Kholyavskiy maintains that the IJ also deprived him of a reasonable opportunity to be heard when the IJ required him to condense materials that he had supplied to the Board in support of his motion to reopen. Essentially, the IJ asked Mr. Kholyavskiy to review the voluminous documentary record that had been compiled for the BIA and to present only those documents pertinent to the specific issues before the court. *See* A.R. at 563-64.[13] Such a request was well within the authority of the IJ to "receive and consider material and relevant evidence, rule upon objections, and otherwise regulate the course of the hearing." 8 C.F.R. § 1240.1(c).

Furthermore, Mr. Kholyavskiy has not shown how the omission of the proffered material prejudiced him. Mr. Kholyavskiy merely identifies some of the materials that were omitted, *see* Appellant's Br. at 24 n.7; however, he does not identify any critical information contained in these materials nor how the receipt of that information would have altered the IJ's decision. Absent such a show-

---

[13] Although the IJ made this request, he later allowed Mr. Kholyavskiy to submit documentation in excess of the usual 100-page limitation. *See* A.R. at 637.

ing, Mr. Kholyavskiy's argument must fail. *See Shmyhelskyy v. Gonzales*, 477 F.3d 474, 482 (7th Cir. 2007) (noting that a showing of prejudice is required).

### 3. Conduct of the Proceedings

Mr. Kholyavskiy also maintains that he was deprived of a reasonable opportunity to be heard because the IJ was predisposed to deny his applications for relief. Mr. Kholyavskiy points to the IJ's characterization of his claim for relief as "dubious" and "ridiculous," A.R. at 613, the IJ's determination that Dr. Wixman was not an expert, and the IJ's repeated interruptions, as evidence of the IJ's intent to deprive him of a fair hearing. We do not believe that these instances, taken individually or collectively, establish that Mr. Kholyavskiy was deprived of a fair hearing.

With respect to the use of "dubious" and "ridiculous," the IJ used this terminology in his discussion with Mr. Kholyavskiy's counsel after the Government had objected to Dr. Wixman's testimony concerning mental institutions. The IJ had been expressing his concerns about the lack of basis for Dr. Wixman's testimony on mental institutions and the lack of connection between Mr. Kholyavskiy's situation and the proposed testimony. The IJ stated that he did not believe that scholars in general would accept the "dubious" proposition that a person who had left Russia when he was fifteen would end up on a government "target" list. A.R. at 613. To assume further that an individual on that target list would be placed in a mental institution was moving from the

dubious to the ridiculous. Thus, read in context, the IJ's comments—although not articulated in the most carefully chosen or judicious language—were not employed to characterize all of Mr. Kholyavskiy's claims for relief, rather they applied simply to the testimony being offered by Dr. Wixman on a discreet subject.

Mr. Kholyavskiy also points to the IJ's "repeated[]" interruptions of testimony as evidence of the IJ's bias. Appellant's Br. at 24. However, the only interruptions noted by Mr. Kholyavskiy are those discussed above concerning Dr. Wixman's testimony. Both were efforts by the IJ to have Mr. Kholyavskiy ground Dr. Wixman's testimony in some objective evidence and to have Mr. Kholyavskiy establish a connection between Dr. Wixman's anecdotes and the views held generally by Russians. These efforts to establish the credentials of Dr. Wixman and the relevancy of the evidence did not hamper Mr. Kholyavskiy's right to a reasonable opportunity to be heard on the issues pertinent to his claim. Indeed, the IJ's actions in this regard were consistent with his responsibility to ensure that the evidence presented was reliable and probative.

**B.**

In addition to challenging the manner in which the IJ conducted the proceedings, Mr. Kholyavskiy also chal-

lenges the BIA's denial of his request for asylum.[14] Congress has given the Attorney General discretion to grant asylum if an applicant qualifies as a refugee under 8 U.S.C. § 1101(a)(42)(A). The Immigration and Nationality Act ("INA") defines "refugee" as

> any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

---

[14] Mr. Kholyavskiy also challenges the BIA's denial of withholding of removal and relief under the CAT. However, because the standards for granting withholding of removal and relief under the CAT are more stringent than the standard for asylum, we address his asylum claim first. *See, e.g., Kaharudin v. Gonzales*, 500 F.3d 619, 623 (7th Cir. 2007), *cert. denied*, 128 S. Ct. 2959 (2008) (observing that withholding of removal requires the petitioner to establish "a clear probability that she will face persecution" and that this is "a more stringent burden than that applied to asylum claims"); *Selimi v. Ashcroft*, 360 F.3d 736, 741 (7th Cir. 2004) (reiterating that "[t]o establish a prima facie case under CAT, [the petitioners] must show that it is more likely than not that they would be tortured" if removed and observing that "[t]his . . . is a more stringent requirement than the requirements for asylum"). If Mr. Kholyavskiy fails to meet his burden with respect to asylum, he necessarily has failed to meet his burden with respect to the other forms of relief that he seeks.

8 U.S.C. § 1101(a)(42)(A). Therefore, to qualify for asylum, the petitioner must establish either that he has suffered past persecution or that he has a well-founded fear of future persecution. *See Ssali v. Gonzales*, 424 F.3d 556, 562 (7th Cir. 2005) (quoting *Capric v. Ashcroft*, 355 F.3d 1075, 1086 (7th Cir. 2004)). If an alien establishes past persecution, this gives rise to a presumption of future persecution that "[t]he Government may rebut . . . if it establishes, by a preponderance of the evidence, that '[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality.'" *Brucaj v. Ashcroft*, 381 F.3d 602, 606-07 (7th Cir. 2004) (quoting 8 C.F.R. § 1208.13(b)(1)(i)(A)). "Even if the Government rebuts the presumption of future persecution . . . , the Attorney General has the authority to grant asylum as a matter of discretion for humanitarian reasons . . . ." *Id.* at 608 (internal quotation marks and citations omitted). Now codified at 8 C.F.R. § 1208.13(b)(1)(iii), an alien may qualify for humanitarian asylum if he "has demonstrated compelling reasons for being unwilling or unable to return to the country [designated for removal] arising out of the severity of the past persecution" or "has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 1208.13(b)(1)(iii)(A) & (B). Regardless of whether the alien qualifies for asylum by establishing past persecution, future persecution or eligibility for humanitarian relief, "the IJ may, in his discretion, deny asylum." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004)

(citing 8 U.S.C. § 1158(a) & (b)).[15]

Eligibility for asylum "is a factual determination which we review under the substantial evidence test." *Sivaainkaran v. INS*, 972 F.2d 161, 163 (7th Cir. 1992). We shall disturb the BIA's findings "only if the record lacks substantial evidence to support its factual conclusions." *Malek v. INS*, 198 F.3d 1016, 1021 (7th Cir. 2000). "To win a reversal under this deferential standard, [the alien] must show not merely that the record evidence supports a conclusion contrary to that reached by the BIA but that the evidence compels that contrary conclusion." *Bradvica v. INS*, 128 F.3d 1009, 1011 (7th Cir. 1997).

Mr. Kholyavskiy claims that he is eligible for asylum based on past persecution, on the likelihood of future persecution and on humanitarian grounds. More specifically, he claims that he was persecuted in the former Soviet Union on account of his Jewish ethnicity and religion. He also claims that, if returned to Russia, he will suffer future persecution because of his Jewish identity and also because of his membership in two social groups: (1) the mentally ill, and (2) returning Jewish refugees.[16] Finally, he claims that he qualifies for a grant

---

[15] Of course, the IJ may not exercise his discretion in an arbitrary or capricious manner. *See Mitev v. INS*, 67 F.3d 1325, 1329 n.3 (7th Cir. 1995).

[16] Mr. Kholyavskiy also argues that he is entitled to a regulatory presumption of future persecution because he already has been accorded refugee status. According to Mr. Kholyavskiy,

(continued...)

of humanitarian asylum under the applicable regulatory standards. We evaluate each of these claims.

---

[16] (...continued)

when he was admitted to the United States in 1992, he was admitted as a refugee. Although he subsequently adjusted his status to that of lawful permanent resident, Mr. Kholyavskiy contends that the adjustment did not alter his status as a refugee. We have held that, when an individual adjusts his status to that of lawful permanent resident, he still may meet the *definition* of a refugee under 8 U.S.C. § 1101(a)(42); however, he no longer retains his refugee *status* under 8 U.S.C. § 1157. *See Gutnik v. Gonzales*, 469 F.3d 683, 699 (7th Cir. 2006).

Here, however, it appears that Mr. Kholyavskiy's prior grant of refugee status was based on a determination that one or both of his parents met the definition of refugee under 8 U.S.C. § 1101(a)(42), not on a determination that he personally met that definition. The BIA determined that, because Mr. Kholyavskiy was a minor at the time of his entry to the United States, he likely was granted asylum on a derivative basis because of the persecution endured by his parents. *See* A.R. at 6. Although the experiences that Mr. Kholyavskiy shared with his family certainly can factor into an asylum analysis, *see infra* at 29-30, Mr. Kholyavskiy has not come forward with any evidence to establish that his prior grant of asylum was based on persecution that he endured, either individually or as a member of his family. In short, Mr. Kholyavskiy simply cannot point to a prior administrative finding of past persecution on which a regulatory presumption of future persecution can be based.

## 1. Past Persecution

Mr. Kholyavskiy challenges the BIA's conclusion that he has not suffered past persecution on the basis of his ethnicity and religion. We have defined persecution as "'punishment' or 'the infliction of harm' which is administered on account of . . . race, religion, nationality, group membership, or political opinion." *Asani v. INS*, 154 F.3d 719, 723 (7th Cir. 1998) (quoting *Borca v. INS*, 77 F.3d 210, 214 (7th Cir. 1996)). "Although the conduct in question need not necessarily threaten the petitioner's 'life or freedom,' it must rise above the level of mere 'harassment' to constitute persecution." *Borca*, 77 F.3d at 214 (citations omitted). "Types of actions that might cross the line from harassment to persecution include: 'detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings, or torture.'" *Begzatowski, v. INS*, 278 F.3d 665, 669 (7th Cir. 2002) (quoting *Mitev v. INS*, 67 F.3d 1325, 1330 (7th Cir. 1995)).

In assessing whether incidents cross the line from harassment to persecution, we look not only at the nature of the abuse that the individual endured, but also the age of the petitioner at the time the events took place. *See Liu v. Ashcroft*, 380 F.3d 307, 314 (7th Cir. 2004). We have stated that, in the adjudication of asylum claims, age "may bear heavily on the question of whether an applicant was persecuted or whether she holds a well-founded fear of future persecution. The Guidelines for Children's Asylum Claims advises that 'harm a child fears or has suffered . . . may be relatively less than that of an adult and still qualify as persecution.'" *Id.* (quoting Guide-

lines for Children's Asylum Claims, INS Policy and Procedural Memorandum from Jeffrey Weiss, Acting Director, Office of Int'l Affairs, to Asylum Officers, Immigration Officers, and Headquarters Coordinators (Asylum and Refugees) 14, (Dec. 10, 1998) (available at 1998 WL 34032561)).

With respect to Mr. Kholyavskiy's claims of past persecution, the IJ stated that

> the respondent's claim is generally limited to two specific incidents: the first was when he was humiliated by his fellow classmates and the second, when he was attacked by a dog belonging to another student. Although the respondent was required to receive rabies shots as a result of the dog bite, neither incident involved serious injury to the respondent.

> Thus, after carefully reviewing the record, the Court finds that the respondent has not demonstrated that he suffered past persecution.

A.R. at 475-76. The BIA took a similar view of Mr. Kholyavskiy's experiences:

> We find that the Immigration Judge correctly found the respondent ineligible for asylum and withholding of removal as he failed to demonstrate either past persecution or a well-founded fear of future persecution. The record illustrates that the respondent's abuse and harassment in Russia by his classmates and school teachers occurred over 13 years ago when he was a child. Moreover, the specific mistreatment the respondent described in his testimony does not rise to the level of persecution under the Act.

A.R. at 323 (internal citations omitted).

We do not believe that these accounts of Mr. Kholyavskiy's experiences accurately depict either the severity or pervasiveness of the abuses he suffered. Turning initially to the first of the "two specific incidents" noted by the IJ, Mr. Kholyavskiy was forced into a school bathroom, where his fellow students pulled down his pants, exposed his genitals and laughed at his cir-cumcision. As one of our sister circuits has observed: "We cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers . . . is impelled by elementary self-respect and personal dignity." *York v. Story*, 324 F.2d 450, 455 (2d Cir. 1963); *cf. Ibrahim v. Titan Corp.*, 391 F. Supp. 2d 10, 12 (D.D.C. 2005) (noting that, among the "broad and serious" allegations of "torture[]" alleged against private contractor were that detainees were "forc[ed] . . . to be naked for prolonged periods of time" and "photo-graph[ed] . . . while naked"). Furthermore, it has been recognized by Congress and the courts that childhood sexual abuse and mistreatment may have harmful, long-term effects. *See, e.g., United States v. Danser*, 270 F.3d 451, 455 (7th Cir. 2001) (discussing Congress' intent "to provide victims of sexual abuse with expansive relief" including "anticipated future costs of psychological treatment"); *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (noting that "[s]exual abuse . . . can cause severe physical and psychological harm").

The second incident mentioned by the IJ was a dog bite. Mr. Kholyavskiy and his mother both recounted this incident in their testimony before the IJ. Mr. Kholyavskiy

stated that a girl "sicced" her dog on him, A.R. at 652; according to Mr. Kholyavskiy, the girl took this action "so that I would not forget who I was," *id.* at 653, namely, a Jew. The attack required a trip to the hospital. The Russian police would not help locate the dog, and, because the dog could not be located, Mr. Kholyavskiy had to undergo a series of forty rabies shots. Mr. Kholyavskiy has permanent physical scarring as a result of the incident.

These two serious incidents must be viewed in light of the more pervasive background of harassment and threats endured by Mr. Kholyavskiy and his entire family. *See Tchemkou v. Gonzales*, 495 F.3d 785, 790 (7th Cir. 2007) (noting that "the agency is obligated to consider the evidence of record as a whole" (internal quotation marks and citations omitted)).[17] Mr. Kholyavskiy testified that his teachers required him, on a quarterly basis, to stand up and identify himself as a Jew and that children regularly mocked him and urinated on him; school officials not only sat silently by, but they also told his parents that the "Jewish child [wa]s just making things up." A.R. at 811. This discrimination and harass-

---

[17] "This court, as well as other courts of appeals, have cautioned IJs against viewing events in the record 'in isolation, rather than considering what kind of patterns they composed,' *Kantoni v. Gonzales,* 461 F.3d 894, 898 (7th Cir. 2006) (collecting cases), and against employing the 'erroneous' 'technique of addressing the severity of each event in isolation, without considering its cumulative significance,' *Poradisova v. Gonzales*, 420 F.3d 70, 79 (2d Cir. 2005)." *Tchemkou v. Gonzales*, 495 F.3d 785, 790 (7th Cir. 2007).

ment pervaded his neighborhood as well. Other children
called him a "kike" and subjected him to physical abuse.
As a result, Mr. Kholyavskiy became afraid both to
attend school and to go outside. Instead, he took to
hiding in the attic of his family's apartment. However, the
record suggests that even Mr. Kholyavskiy's home was
not a safe haven. Vandals had marked his family's mail-
box with a Star of David, and his family received threaten-
ing telephone calls warning them of a coming "Crystal
Night" or pogrom.

A review of the BIA's decision leaves us with the con-
viction that the Board did not consider the "cumulative
significance" of the events recounted by Mr. Kholyavskiy
and his mother. *Tchemkou*, 495 F.3d at 790 (quoting
*Poradisova*, 420 F.3d at 79). More important, the BIA had
an obligation to evaluate the impact of these actions on
a child between the ages of eight and thirteen. It does not
appear, however, that, in addressing the question of past
persecution, the BIA considered Mr. Kholyavskiy's age
at the time these events occurred—a factor that, we have
noted, "may bear heavily on the question of whether
an applicant was persecuted." *Liu*, 380 F.3d at 314.

In sum, the BIA did not employ the correct standard in
evaluating Mr. Kholyavskiy's claims. The proper course
of action in these circumstances is not for us to decide the
question of past persecution in the first instance, but
to allow the BIA to re-evaluate the evidence under the
proper standard. *Ramirez-Peyro v. Gonzales*, 477 F.3d 637,
641 (8th Cir. 2007) ("Generally speaking, a court of
appeals should remand a case to an agency for decision of

a matter that statutes place primarily in agency hands."
(quoting *INS v. Ventura*, 537 U.S. 12, 16 (2002))); *see also Asani*, 154 F.3d at 723 (remanding to the BIA to apply the correct standard for persecution under the asylum laws). Therefore, we remand for further proceedings Mr. Kholyavskiy's application for asylum based on past persecution. We are confident that, on remand, the BIA will evaluate the record comprehensively according to the standard that we have articulated here.[18]

## 2. Future Persecution

Mr. Kholyavskiy also maintains that, if returned to Russia, he will suffer persecution on several grounds, specifically on the basis of his Jewish identity and his membership in two social groups: the mentally ill and Jewish refugees who resettled in the United States. The

---

[18] The IJ determined that, had Mr. Kholyavskiy met the requirements for asylum, he would not have exercised his discretion in Mr. Kholyavskiy's favor. This determination is based largely on a misunderstanding of the nature of Mr. Kholyavskiy's mental illness, *see* discussion *infra* at pages 33-35, and of the strength of Mr. Kholyavskiy's asylum claim, which we have discussed at length above. Thus, the IJ's statements in this regard do not preclude our remand to the BIA for further proceedings. *See Zhang v. Gonzales*, 434 F.3d 993, 1002 (7th Cir. 2006) (remanding for further proceedings, despite "IJ's alternative determination that Zhang would not merit a favorable exercise of discretion even if he were found eligible for asylum" because determination was based on erroneous factual determinations and improper legal considerations).

Board determined that Mr. Kholyavskiy's status as a Jew and as a member of his Jewish family qualified him for protection under the asylum law. However, it held that Jewish refugees resettled in the United States and mentally ill were not "particular social groups" entitled to protection. In any event, it determined that he was not likely to suffer future persecution on any of these bases. We evaluate these determinations below.

### a. refugee status

We turn first to the question whether Mr. Kholyavskiy was a member of any social group protected by the asylum laws. With respect to the first of these—Jewish refugees returning from the United States—the Board stated that this group does not have a shared characteristic that is fundamental to its members' individual identities or consciences. *See* A.R. at 4. Other than repeating that his status as a Jew and as a refugee living in the United States cannot be changed, Mr. Kholyavskiy does not attempt to address the Board's concern that the individual members of this group lack the social visibility and recognizability usually required to establish a "social group." *See* Appellant's Br. at 27-28.

Essentially, Mr. Kholyavskiy attempts to reverse the statutory methodology for determining whether one qualifies as a refugee. Instead of establishing his membership in a particular social group and then showing the possibility of persecution based on that social group membership, Mr. Kholyavskiy attempts to show that he likely will suffer discrimination on a number of bases—his

Jewish identity, his status as a returning refugee, and his ties to the West. The combination of those categories, he maintains, is a social group, and the cumulative effect of the discrimination is persecution.

Because Mr. Kholyavskiy has not met his burden of establishing that returning Jewish refugees meet the criteria of a "particular social group," we affirm the BIA's denial of discretionary relief on this basis.

### b. mental illness

Mr. Kholyavskiy also claims that he will be persecuted on the basis of his mental illness and that the mentally ill constitute a social group for purposes of asylum. The IJ stated:

> The Court finds that under the circumstances of this case, the respondent's mental illness does not constitute[] a cognizable "particular social group." Specifically, his illness is not immutable. Unlike one's tribal affiliation or parentage, the respondent's mental illness can be treated with medication such that by his own actions he will be able to avoid persecution. Accordingly, the respondent's mental illness is not a cognizable basis for seeking asylum.

A.R. at 477 (footnotes omitted). The BIA "agree[d]" with these findings. *Id.* at 3.

This determination is not supported by the record. In his affidavit, Dr. Jacobson recounted the history of Mr. Kholyavskiy's treatment. Beginning in 2002, he began his

current medications, which, thus far, have been most effective at controlling his mental illness. Dr. Jacobson noted that, as of April 15, 2003, Mr. Kholyavskiy was able "to get back into sports in the limited setting of boxing." A.R. at 938. As of September 23, 2003, Mr. Kholyavskiy continued to box, "but that was the entire extent of his socialization. Otherwise, he would remain largely at home. . . . Within the family itself, *he remained withdrawn*. Since then, he has been on a combination of Paxil and Klonopin. *He remains incapable of tolerating close, interpersonal relationships*." *Id.* (emphasis added).

Dr. Jacobson's affidavit further expounded on Mr. Kholyavskiy's current diagnosis; he stated accordingly: "He does have a character disorder. This consists of avoidant, schizoid, and narcissistic personality features. At this point, *I do not believe that his personality disorder is amenable to change. . . .*" A.R. at 939 (emphasis added). Furthermore, he noted that Mr. Kholyavskiy's "[c]urrent treatment for social anxiety disorder consists of medications of the SSRI class"; Dr. Jacobson further explained that Mr. Kholyavskiy had responded well to Paxil, in combination with Klonopin. A.R. at 939-40. With respect to this disorder, Dr. Jacobson concluded that Mr. Kholyavskiy's "prognosis for remaining comfortable *but disabled* on Paxil and Klonopin is good." *Id.* at 940 (emphasis added). According to Dr. Jacobson, therefore, not only are Mr. Kholyavskiy's disorders permanent, they also are not completely controlled by medication.

As noted above, the IJ and the BIA determined that Mr. Kholyavskiy's mental illness did not place him in a particular social group because his mental illness was not an

"immutable" trait—a conclusion which finds no support in the record. The BIA did not consider whether, if the illness were "immutable," Mr. Kholyavskiy's condition would qualify him for membership in a particular social group. Consequently, under usual circumstances, we would remand to the BIA for further consideration of whether the mentally ill otherwise qualify for social group status. However, we need not follow this path here because, the BIA also determined that, even if the mentally ill qualified as a particular social group, Mr. Kholyavskiy had not established that, if he were returned to Russia, he likely would suffer persecution on the basis of his mental illness. *See* A.R. at 323.[19] We do not believe that the record compels a contrary result.

In his brief, Mr. Kholyavskiy identifies only two documents in the record that speak to "a prevalent anti-mental illness attitude" and "considerable lack of mental health treatment" in Russia. Appellant's Br. at 38. After reviewing those documents, we cannot agree with Mr. Kholyavskiy's summary of their contents. The most recent of these documents note that "[p]rogress has been made in instituting legal provisions for humane and responsible health care for the mentally ill" and that these provisions set "minimum standards for humane treatment of psychiatric patients." A.R. at 1054-55. Another, more recent document among Mr. Kholyavskiy's submitted materials observes that "[a] series of reforms have seen

---

[19] Mr. Kholyavskiy never has claimed that he has suffered past persecution on the basis of his mental illness.

the focus of psychiatric care change. Sprawling, stark asylums are being replaced with modern hospitals, with patients allowed to live in the community as much as possible." A.R. at 1129.

It appears that Mr. Kholyavskiy's true—and very legitimate—concern is not that he will suffer future persecution on the basis of his mental illness, but that, if returned to Russia, he will not be able to obtain Paxil and Klonopin, the medications that effectively have kept many of his symptoms in check.[20] However, there is no evidence in the record to suggest that the unavailability of the medication is the result of the Russian government's attempt to injure Mr. Kholyavskiy or, more generally, individuals with mental illnesses, and, as we have observed on many occasions, "the motive of those engaging in oppressive actions is a 'critical' element" of the asylum laws. *Tamas-Mercea v. Reno*, 222 F.3d 417, 425 (7th Cir. 2000) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992)). Thus, with respect to its determination that Mr. Kholyavskiy did not establish his eligibility for asylum based on his mental illness, the BIA's decision is supported by substantial evidence. However, as we shall discuss later in this opinion, the unavailability of

---

[20] The IJ discounted Mr. Kholyavskiy's fear because, according to the IJ, his parents could "mail" him the medication. *See* A.R. at 477. However, there simply is no basis in the record for establishing that Mr. Kholyavskiy's doctor ethically could prescribe these medications without on-going supervision or that Mr. Kholyavskiy's parents legally could ship the medications internationally.

Mr. Kholyavskiy's medications is a valid consideration for purposes of humanitarian asylum. *See infra* pp. 39-42.

### c. Jewish ethnicity and religion

In addition to his other social group memberships, Mr. Kholyavskiy also maintains that he will endure future persecution on the basis of his Jewish identity.[21] The BIA and the IJ both determined that Mr. Kholyavskiy had not demonstrated that his fear of future persecution is objectively reasonable given current country conditions.[22]

> First, the department of State's country reports indicate that while Jews continue to face societal discrimination, prejudice, and occasional acts of violence, there does not appear to be a pattern of systemic abuse against Jews which rises to the level of persecution. Further, Jewish leaders have publicly said that the state-sponsored anti-Semitism of the Soviet era no longer exists in Russia.

---

[21] The BIA recognized that "the respondent's Jewish background can constitute more than one protected ground under the Act." A.R. at 4.

[22] "The case-specific establishment of a well-founded fear of future persecution encompasses objective and subjective elements. To satisfy the subjective component, an individual must show that he has a genuine fear of returning to his home country. To satisfy the objective component, the applicant must demonstrate that a reasonable person in his circumstances would fear persecution if forced to return to his native country." *Kllokoqi v. Gonzales*, 439 F.3d 336, 345 (7th Cir. 2005) (citations omitted).

A.R. at 323; *see also* A.R. at 477-78 (decision of the IJ noting the Russian government's official condemnation of anti-Semitism, efforts by the government to combat hate-based crimes, and statements by Jewish leaders that the government has been taking steps to combat anti-Semitism). These conclusions find support in the record. *See* A.R. at 1012 (country report). The record as a whole reveals that "Jews continued to face prejudice, discrimination and some acts of violence," without, however, the official imprimatur of the Soviet regime. *Id.* Indeed, such actions likely will be met with official condemnation and possibly prosecution, although the response varies widely accordingly to locale. *Id.* at 1043. In short, the record does not paint a picture of an ethnically and religiously tolerant Russia; however, that is not the focus of the asylum law. The question for purposes of the asylum law is whether Mr. Kholyavskiy, as a Jew, will be persecuted on that basis if returned to Russia. "Persecution is something a government does, either directly or by abetting (and thus becoming responsible for) private discrimination by throwing in its lot with the deeds or by providing protection so ineffectual that it becomes a sensible inference that the government sponsors the misconduct." *Hor v. Gonzales*, 400 F.3d 482, 485 (7th Cir. 2005). Based on the evidence before the BIA, we cannot say that the record compels a conclusion that, if returned to Russia, Mr. Kholyavskiy will be persecuted by the Russian government.

For the same reasons, we cannot say that Mr. Kholyavskiy has met his burden under the CAT to establish that, if removed, he will more likely than not be tortured by the Russian government. *See* 8 C.F.R.

§ 208.16(c)(2) ("The burden of proof is on the applicant . . . to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.").

We note that the burden was on Mr. Kholyavskiy, in the first instance, to establish future persecution and that our review of the BIA's determination as to whether Mr. Kholyavskiy met his burden is based on the record before us and is highly deferential. Our decision, there-fore, has no bearing on whether, on remand, the Govern-ment will be able to rebut any presumption of future persecution based on the conditions in Russia at that time.

## C.

Finally, we turn to Mr. Kholyavskiy's claim of humani-tarian asylum. Humanitarian asylum originated with the BIA's recognition in *Matter of Chen*, 20 I. & N. Dec. 16, 18 (BIA 1989), that an alien may have endured such severe persecution that, even in the absence of a threat of future persecution, removal to his country of origin would be inhumane. As referenced above, this type of asylum is now codified at 8 C.F.R. § 1208.13(b)(1)(iii).[23] As

---

[23] The regulation provides in relevant part:

> (b) Eligibility. The applicant may qualify as a refugee either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution.

> (1) Past persecution. An applicant shall be found to be a refugee on the basis of past persecution if the applicant can
> (continued...)

[23] (...continued)

establish that he or she has suffered persecution in the past in the applicant's country of nationality or, if stateless, in his or her country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion, and is unable or unwilling to return to, or avail himself or herself of the protection of, that country owing to such persecution. An applicant who has been found to have established such past persecution shall also be presumed to have a well-founded fear of persecution on the basis of the original claim. That presumption may be rebutted if an asylum officer or immigration judge makes one of the findings described in paragraph (b)(1)(i) of this section. If the applicant's fear of future persecution is unrelated to the past persecution, the applicant bears the burden of establishing that the fear is well-founded.

(i) Discretionary referral or denial. Except as provided in paragraph (b)(1)(iii) of this section, an asylum officer shall, in the exercise of his or her discretion, refer or deny, or an immigration judge, in the exercise of his or her discretion, shall deny the asylum application of an alien found to be a refugee on the basis of past persecution if any of the following is found by a preponderance of the evidence:

(A) There has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality or, if stateless, in the applicant's country of last habitual residence, on account of race, religion, nationality, membership in a particular social group, or political opinion; or

(B) The applicant could avoid future persecution by relocating to another part of the applicant's country of nationality

codified, the Attorney General

> may grant humanitarian asylum to a victim of past persecution, even where the government has rebutted the applicant's fear of future persecution, if the applicant establishes one of two things. First, the asylum seeker can show "compelling reasons for being unwilling or unable to return to the country [that he fled] arising out of the severity of the past persecution." 8 C.F.R. § 1208.13(b)(1)(iii)(A). *Or*, under the second prong of the humanitarian asylum analysis, the

---

[23] (...continued)

> or, if stateless, another part of the applicant's country of last habitual residence, and under all the circumstances, it would be reasonable to expect the applicant to do so.

> (ii) Burden of proof. In cases in which an applicant has demonstrated past persecution under paragraph (b)(1) of this section, the Service shall bear the burden of establishing by a preponderance of the evidence the requirements of paragraphs (b)(1)(i)(A) or (B) of this section.

> (iii) Grant in the absence of well-founded fear of persecution. An applicant described in paragraph (b)(1)(i) of this section who is not barred from a grant of asylum under paragraph (c) of this section, may be granted asylum, in the exercise of the decision-maker's discretion, if:

> (A) The applicant has demonstrated compelling reasons for being unwilling or unable to return to the country arising out of the severity of the past persecution; or

> (B) The applicant has established that there is a reasonable possibility that he or she may suffer other serious harm upon removal to that country.

asylum seeker can show "a reasonable possibility that he or she may suffer other serious harm upon removal to that country." 8 C.F.R. § 1208.13(b)(1)(iii)(B); *see also Belishta v. Ashcroft*, 378 F.3d 1078, 1081 (9th Cir. 2004).

*Hanna v. Keisler*, 506 F.3d 933, 939 (9th Cir. 2007) (emphasis added).

The IJ determined that the abuses that Mr. Kholyavskiy suffered did not rise to the level of severity associated with a grant of humanitarian asylum. *See* A.R. at 479.[24] It is true that, typically, humanitarian asylum has been reserved for those who have endured torture, extended imprisonment or repeated physical abuse, usually at the hands of totalitarian regimes. *See, e.g.*, *Bucur v. INS*, 109 F.3d 399, 405 (7th Cir. 1997) (listing "German Jews, the victims of the Chinese 'Cultural Revolution' . . . [and] survivors of the Cambodian genocide" as examples of individuals who may qualify for humanitarian asylum). We do not mean to diminish, in any way, the seriousness of the abuses endured by Mr. Kholyavskiy and the attendant effects on Mr. Kholyavskiy's mental health; nevertheless, even considering Mr. Kholyavskiy's age at the time, we cannot equate Mr. Kholyavskiy's experiences in the former Soviet Union with the truly heinous abuses endured by the victims of the Holocaust or the "Cultural Revolution."

---

[24] The BIA did not address directly Mr. Kholyavskiy's claim of humanitarian asylum. It did determine, however, that the abuses suffered by Mr. Kholyavskiy did not rise to the level of persecution. *See* A.R. at 323.

This does not end, however, our discussion of humanitarian asylum. As noted above, the regulation provides two means of qualifying for a grant of humanitarian asylum. Mr. Kholyavskiy cannot avail himself of the first means by relying on the "severity of the past persecution," 8 C.F.R. § 1208.13(b)(1)(iii)(A), but he still has available to him the second means—establishing that he suffered past persecution, *see* 8 C.F.R. § 1208.13(b)(1)(i), and "that there is a reasonable possibility that he . . . will suffer other serious harm upon removal to that country," *id.* § 1208.13(b)(1)(iii)(B). As discussed above, there is evidence in the record to suggest that Mr. Kholyavskiy suffered past persecution. Similarly, the record suggests that, if returned to Russia, Mr. Kholyavskiy would be without the only medications that effectively have controlled the symptoms of his mental illness and would be incapable of functioning on his own. It also is highly questionable whether he would be able to obtain housing and medical treatment, especially given his lack of "propiska." *See supra* note 5. Debilitation and homelessness both would appear to constitute serious harms for purposes of 8 C.F.R. § 1208.13(b)(iii)(B).

However, neither the BIA nor the IJ addressed whether Mr. Kholyavskiy qualified for humanitarian relief based on his past persecution and the "possibility [of] . . . other serious harm." *Id.* Because this is a determination that the agency should make in the first instance, *see supra* pp. 30-31, we remand this issue for further consideration by the BIA.

**Conclusion**

In evaluating Mr. Kholyavskiy's claim for asylum based on past persecution and based on humanitarian concerns, the BIA failed to apply the correct legal standard and to evaluate the record as a whole. However, its determination with respect to Mr. Kholyavskiy's claim of asylum based on future persecution is supported by substantial evidence.[25] For these reasons, the petition for review is granted in part and denied in part, and the case is remanded to the BIA.

On remand, the BIA first must determine whether, according to the standards that we have articulated here, Mr. Kholyavskiy has suffered past persecution. If it determines that Mr. Kholyavskiy has suffered past persecution, it then must evaluate whether the Government has met its burden of rebutting the presumption of future persecution based on conditions in Russia at that time—a determination that undoubtedly will require the consideration of new evidence. Finally, the BIA must evaluate Mr. Kholyavskiy's claim for humanitarian asylum under the regulatory standard set forth in 8 C.F.R. § 1208.13(b)(iii)(B).

---

[25] Similarly, the BIA's denial of withholding of removal and of relief under the CAT finds support in the record.

The parties will bear their own costs on this appeal.

PETITION GRANTED in part and
DENIED in part; REMANDED